ORIGINAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| ZOHO CORPORATION, | ) | **Claims Construction** |
| | ) | **Hearing** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 19-00001 YGR |
| | ) | |
| SENTIUS INTERNATIONAL, LLC, | ) | **Pages 1 - 93** |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, May 8, 2020 |
| SENTIUS INTERNATIONAL, LLC | ) | |
| | ) | |
| Counter-Claimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ZOHO CORPORATION, | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES (VIA ZOOM WEBINAR):**

For Plaintiff:        Marton Ribera Schulmann & Chang LLP
                      548 Market Street, Suite 3617
                      San Francisco, California  94107
                 BY:  PHILLIP J. HAACK,
                      RYAN J. MARTON, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:       Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

**A P P E A R A N C E S (CONT'D.)**

```
For Defendant:          Carr & Ferrell LLP
                        120 Constitution Driver
                        Menlo Park, California  94025
                BY:  ROBERT J. YORIO, ATTORNEY AT LAW

                        Seth Law Offices
                        Two Allen Center
                        1200 Smith Street, Suite 1600
                        Houston, Texas  77002
                BY:  SANDEEP SETH, ATTORNEY AT LAW
```

--o0o--

```
 1   Friday, May 8, 2020                              9:09 a.m.

 2                      P R O C E E D I N G S

 3                       (by Zoom webinar)

 4         THE CLERK:  Calling civil action 19-001, Zoho

 5   Corporation versus Sentius International.

 6      Counsel, please state your appearances.

 7         THE COURT:  For Zoho?

 8         MR. MARTON:  Ryan Marton for Zoho.  With me is Phil

 9   Haack for Zoho.

10         THE COURT:  Okay.  And for Sentius?

11         MR. YORIO:  Robert Yorio and Sandeep Seth for

12   Sentius, Your Honor.

13         THE COURT:  All right.  Good morning, everyone.

14      Let's just make sure that we understand the terms that --

15   the order of the terms.  So are we starting with "beginning

16   position address of a textual source material"?

17         MR. MARTON:  Yes, Your Honor.

18         THE COURT:  And --

19         MR. YORIO:  I summarize the conferences that we've

20   had with counsel.

21                  (Simultaneous colloquy.)

22         MR. YORIO:  The order that the terms will be

23   addressed in argument is the same as you see it in the slides,

24   same order as in the joint claim construction statement and

25   the briefs.
```

 1          **THE COURT:**  Okay.  So --

 2          **MR. YORIO:**  '633 patent terms will come first.  The

 3     three '985 patent terms will come last.  We have discussed

 4     reserving enough time so the last three terms don't get

 5     rushed, and we're going to try to -- to reserve about 45 to 50

 6     minutes for those final three terms.

 7          **THE COURT:**  Okay.

 8       And -- well, let's are -- have you split up the argument

 9     between the four of you?  Or is there just going to be two

10     people that I'm addressing here?

11          **MR. YORIO:**  On the Sentius side, Mr. Seth and I will

12     split the terms.

13          **THE COURT:**  All right.  Mr. Marton, how about on your

14     side?

15          **MR. MARTON:**  Yes.  We will be splitting up the

16     argument.  I'll be doing the '633 terms, and Phil Haack will

17     be doing the '985 terms.

18          **THE COURT:**  All right.  Well, then let's start at the

19     beginning, that being the "beginning address" -- the

20     "beginning position address of a textual source material."

21       Zoho's position first is that there was no construction

22     needed so Sentius may begin.

23          **MR. SETH:**  Sorry.  Let me unmute.

24       I'll be handling this term, Your Honor.

25       Now, with regard to this term, there's a -- a number of

1   things that have, I think, become clear over the course of

2   this litigation and the tutorial, and that is that neither

3   side disputes that the way visual editors work is character

4   position by character position.

5       And the invention of the '633 patent is to take advantage

6   of the mapping between the display address -- the undisputed

7   mapping I should say between the display address and the

8   character position that all visual editors have so that Your

9   Honor or myself or anybody using the visual editor can go to a

10   particular location on the screen and then add a character,

11   delete a character, add a string of characters to form a word

12   and -- and the '633 patent takes advantage of that, as was

13   extensively discussed at the tutorial.

14       Throughout the -- the -- the -- and I think the issue here

15   is -- is really what we're -- what are we talking about when

16   we're talking about an address.  And again, this is I

17   believe --

18           THE COURT:  Can I ask you whether an offset value is

19   the same thing as an address from your perspective?

20           MR. SETH:  No.

21           THE COURT:  Yes or no?

22           MR. SETH:  An offset value --

23           THE COURT:  Mr. Seth.  Mr. Seth, I need a "yes" or

24   "no" answer to my question.

25       Is an offset value the same thing as an address, yes or no

1    from your perspective?

2          **MR. SETH:**  An offset is also an address.

3          **THE COURT:**  And --

4          **MR. SETH:**  In the context --

5          **THE COURT:**  Mr. Marton, is an offset value the same

6    thing as an address from your perspective?

7          **MR. MARTON:**  Yes.  To the starting point address and

8    the ending point address, the patent makes clear with Figure 2

9    that those are offset values.

10     "Address" can mean different things in different contexts.

11    It's the address -- you know, the address of a house is

12    different than the address in a database.  Display screen

13    address is different than an address in a database.  But

14    for --

15          **THE COURT:**  Clearly.

16              (Simultaneous colloquy.)

17          **THE COURT:**  Go ahead.  Finish your statement.

18          **MR. MARTON:**  What's in Figure 2, which refers to the

19    starting and end point addresses, which are recorded for each

20    discrete piece that is put in the lookup table, the patent

21    makes very clear with Figure 2 that those are offset values.

22     I don't think that the --

23          **THE COURT:**  I also -- okay.  That's fine.  That's why

24    I'm asking the question.

25     The second question is -- and just to confirm, right, the

1  term that -- there is no instance in this patent where the

2  term can mean a different thing given the different --

3  different parts of the patent.

4        So as a for instance, the address that is referenced in

5  disputed term number one has to have the same meaning as the

6  address that is referenced in disputed terms number two.

7            **MR. MARTON:**   Your Honor, if I may address that, no

8  pun intended.

9        Yes, I agree that as a general claim construction

10  principal, terms must have the same meaning throughout a

11  patent and particularly in a claim.

12        However, when we're looking at, say, claim 62 of the

13  patent, the first instance of "address" is the beginning

14  position of address in an electronic database, in a database.

15  So it's an address in a database.

16        Now, the second instances of "address" are starting point

17  address and ending point address of the cutup pieces of the

18  source material.  And those are described as by offsets from

19  that beginning position address in the database.

20        Now, they're not inconsistent because they're both talking

21  about locations in memory, whether virtual or physical.  But

22  what you're dealing with is a position in a database, and then

23  an offset from that position in memory which is the

24  beginning -- it's the starting point address for a cutup piece

25  and then the ending point address for a cutup piece.  Those

1  instances of addresses are byte offsets from an address in a

2  database.

3     Then the fourth instance of "address" in the claims is the

4  display address, and that's just -- the only thing that it's

5  described in the patent for that are coordinates, screen

6  coordinates, and that can be an address, too.

7     So I think "address" at a high level can mean, you

8  know, the -- an -- a point of location, but what it means in a

9  particular instance may be different.  So a house address is a

10 numbers in a street.  Here, an address in a database is a

11 memory location.  And -- and starting point and ending point

12 addresses are byte offsets from that location.

13         THE COURT:  But then doesn't that defeat your claim

14 that no construction is needed?

15         MR. MARTON:  Oh.  No, I -- I don't think so.  No

16 construction is needed for the first instance of "address"

17 because I think the patent makes -- the claim makes very clear

18 that the address -- and if I can share a screen, I can show

19 the claim.  It might be a little easier.

20         THE COURT:  All right.  Hold on.

21         MR. MARTON:  All right.

22         THE COURT:  Hold on a minute.

23         MR. MARTON:  I -- okay.

24    When you're ready, I'll do it.

25         THE COURT:  Okay.  Go ahead.

```
 1                    (Demonstrative published.)

 2           MR. MARTON:  Let me flip down to this claim.  So

 3     we're dealing with "beginning position address of textual

 4     source material stored in an electronic database."  I think

 5     claim language itself is clear that that beginning position

 6     address is a beginning position address in an electronic

 7     database.

 8           If -- if there is any ambiguity, I think we could say,

 9     okay, well, the address at which the source material starts --

10     the textual source material starts in an electronic database.

11           THE COURT:  Well, and as I looked at the arguments,

12     you know, Sentius is really focused on this use of character

13     position as opposed to something where it starts.

14           And so, Mr. Seth, what I need you to focus on is why you

15     think I should be importing that reference to a character

16     position.

17           So if you can take that off the screen, Mr. Marton.  Thank

18     you.

19           MR. MARTON:  Sure.  Let me figure out how.  Here we

20     are.

21           MR. SETH:  Your Honor, I -- I would say this.  I

22     don't believe that the proposed construction of Zoho is

23     inaccurate.  It is, however, I don't believe very helpful to a

24     jury.

25           So throughout the patent, and -- and if I may share a
```

 1    screen now.

 2              **THE COURT:**  Go ahead.

 3                    (Demonstrative published.)

 4         **MR. SETH:**  Sorry, Your Honor.

 5       Throughout the patent -- and I'm at -- are you seeing

 6    Slide 3 of my deck, please?

 7              **THE COURT:**  I am.

 8         **MR. SETH:**  Okay.  Very good.

 9       Throughout the patent, the -- the positions, if you will,

10    in the database are the position offsets from the beginning of

11    the text.

12         And, you know, it's -- it's undisputed that all visual

13    editors work off of characters by characters so that you can

14    input characters, edit characters to form words, and otherwise

15    do your word processing.

16         So throughout the patent, we're talking about having a

17    beginning position which --

18              **THE COURT:**  Let me ask you, what about a situation

19    where the very first position is blank, there's nothing in it?

20         **MR. SETH:**  Um-hmm.  Yes, Your Honor.  That's -- a

21    blank is also a character within character schemes such ASCII.

22    So even that blank has to have a character position to show

23    that there's nothing at that particular character position.

24              **THE COURT:**  So let me ask -- let me ask how this --

25    how this would play out given what's described in the patent.

 1          If you have an offset from a starting point in a -- as

 2     you're describing a word or however it's calculated, how does

 3     the lack of textual source material, which is in a first, in a

 4     blank, how does that play out?

 5          **MR. SETH:**  I'm sorry.  Could you repeat the question,

 6     Your Honor?

 7          **THE COURT:**  I'm trying to understand -- so the

 8     beginning position of a textual source material, that doesn't

 9     include a blank, correct?

10          **MR. SETH:**  No, it does actually, Your Honor, because

11     the -- the textual -- characters for -- of text do include a

12     character code for a blank space.  And, in fact, that

13     character code for a blank space is part of how parsers then

14     identify where the beginning of a word is and where the end --

15     the -- the first character of the word is and the -- the

16     ending character.

17          So let's say, you're -- you're starting your text and for

18     some reason, instead of putting in -- you want to type in

19     "the" and instead of typing the "T" at the zero place, you --

20     you hit the space bar.  That space bar is recorded as a

21     character.  That zero position may be a space bar -- or a

22     space.  That zero position may be a -- a "T" for "the" or

23     what -- or whatever you -- you started typing.

24          But you -- you either hit the space bar or you hit

25     something else on your keyboard.  But whatever that first

 1    starting point is, that -- that is where your -- that's the
 2    reference -- that's the beginning position of the textual
 3    source material, and then you're starting to count characters
 4    from -- from those.
 5        And those characters in the '633 patent were Kanji
 6    characters.  Those are actually two-byte characters, for
 7    example.  So each two bytes is a character.  In ASCII, one
 8    byte is a character.  But what you're doing is whatever your
 9    coding scheme is, you're going character by character so that
10    every character has a corresponding display position because
11    when you're the visual editor and you've opened the document,
12    and it's got some text in it, you're going to parse through,
13    you're going to see what all the positions of the text are,
14    including the space bars, and then you're going to display all
15    of that in the same order that each character is within the
16    document.
17            **THE COURT:**  All right.  A response, Mr. Marton?
18        So Mr. Seth believes that your construction isn't wrong;
19    it's just not helpful.
20            **MR. MARTON:**  Well, I disagree with virtually -- well,
21    most of the things Mr. Seth just said.
22        One, our construction is helpful -- well, no construction
23    is needed, but if construction is needed, our construction is
24    helpful.
25        I think where we're having a dispute here is whether the

 1    location -- the information -- if I could bring up my screen,

 2    actually, it might be helpful.

 3            **THE COURT:**  All right.  Go ahead.

 4            **MR. MARTON:**  Mr. Seth, if you could take your screen

 5    down.

 6            **MR. SETH:**  Oh, I'm so sorry.

 7            **MR. MARTON:**  Thank you.

 8                    (Demonstrative published.)

 9            **MR. MARTON:**  So I -- I -- I think our dispute -- I'm

10    going to go up to just this --

11                    (Demonstrative published.)

12            **MR. MARTON:**  -- which is Figure 2.  I think our

13    dispute is what these numbers, for example, in Figure 2, 10

14    and 15 mean.  And what Mr. Seth is contending is that these

15    are character offsets from the beginning of a document, so

16    the -- within the file itself.

17        And what Zoho contends and I think what the patent and the

18    file history makes abundantly clear is that these are not

19    character offsets within the document.  These are byte offsets

20    which are distances in memory from a location in memory.

21        So this ten would be ten bytes into the memory from -- the

22    memory in the database from the beginning position of where

23    the source material and -- the source material is stored.

24        And this 15 would be 15 bytes into the memory from the

25    beginning of the address in the database where the source

1    material is stored.

2         Now, what Mr. Seth is saying is that we don't care about

3    memory location.  We only care about character points within a

4    document.  And he's asserted that, you know, this patent, the

5    '633 patent, is all about visual editors and that there's no

6    dispute that visual editors work based off character offset so

7    obviously that is what the '633 means.

8         Now, there is a dispute here.  The dispute is the '633 is

9    not about visual editors.  It's not about modifying visual

10   editors, and -- and we haven't gotten to the issue of whether

11   all visual editors work on character offsets.  I personally

12   don't know.  And it's not really relevant to this case because

13   this patent's not about modifying visual editors.

14        And notably, the patent says nothing about character

15   offsets and character positions.  What it says is "offsets."

16   And then if you look at the file history --

17                     (Demonstrative published.)

18        **MR. MARTON:**  -- it's really clear that what we're

19   dealing with is byte offsets.  And --

20                     (Demonstrative published.)

21        **MR. MARTON:**  -- during the --

22        **THE COURT:**  So I -- if I could just interrupt for a

23   second, and you can go back to your thought.

24        **MR. MARTON:**  Okay.

25        **THE COURT:**  So it would be your contention, then,

 1    that in light of the prosecution history, an address is really

 2    expressed in terms of bytes, that the focus should be bytes

 3    not characters.

 4         **MR. MARTON:**  Yes, in terms of the -- the -- the

 5    starting point address of the discrete pieces and the ending

 6    point address.  Those are in bytes.  And then the beginning

 7    position address, which is the anchor point from those byte

 8    offsets, that is an address in a database.  That is a memory

 9    address.  Whether virtual or physical, it's a -- it's a memory

10    address in a database.

11         So that -- that is what was made very clear to me in

12    the -- in the file history.

13         The -- the patent is pretty -- there's not a lot said

14    about this process in the patent.  Everything about this

15    process is contained in Figures 1 and 2 and columns 5 and 7,

16    and it's -- it's pretty limited.

17         But the -- but the file history and -- and particularly

18    the file history for the parent application is pretty clear.

19         In that prosecution history, we had a claim that is very

20    much like the claim we're dealing with here, which had a

21    "determining the beginning position of a source material

22    image."

23         And notably, Sentius contends, well, this is very

24    different because it says "source material image" rather than

25    "textual source material."  But in prior litigation, in

1    particular, the *Flyswat* litigation, Sentius actually

2    characterized this source material image as the material that

3    goes into the system to be cut up and then linked to external

4    sources, so it's -- it is the same thing.

5        But in any case, in the '720 history, which is the parent

6    application, we're dealing with a claim and -- particularly a

7    claim limitation "determining the beginning position of a

8    source material image," and this claim was rejected by the

9    patent office in light of a patent that we'll refer to as the

10   Cassorla, which is U.S. patent number 5,146,522.

11       And in that patent, there was an offset table, much like

12   Figure 2, which linked locations -- words in an electronic

13   document to external material or annotations.  And the way

14   that the location of those words was -- was characterized

15   in -- in the lookup table -- and here on Slide 29, we're

16   looking at Figure 3 from Cassorla.  This is that lookup table.

17   They had coordinates for words within the document.  And

18   that's the -- so these -- these are the coordinates.  And

19   these were relative positions within the document.

20       And the way this worked --

21                 (Demonstrative published.)

22           **MR. MARTON:**  So if we wanted to identify the location

23   of a word "remarkable" in this example document here on

24   Slide 30, you would first identify the chapter, which would be

25   C1, and then the paragraph, which we're down in the third

```
1    paragraph, so --

2              THE COURT:  Right.

3              MR. MARTON:  -- P3.

4              THE COURT:  You did that before.

5              MR. MARTON:  Yeah.  And then the sixth word in -- and

6    there we have "remarkable," and that would be recorded as

7    C1P3W6.

8         Now, in --

9                   (Demonstrative published.)

10             MR. MARTON:  -- response to that rejection on

11   Slide 36, Sentius explained, well, Cassorla requires paragraph

12   and word offsets in which links are determined by paragraph

13   number and an offset with -- an offset within the paragraph.

14        In contrast, the claimed invention operates upon pure byte

15   offsets.  Now, what's significant about this is, you know,

16   Sentius says, well, bytes and character are one and the same

17   thing.  Well, Mr. Seth just admitted that "byte" and

18   "character" are not one and the same things.

19        A Kanji character is rarely one byte.  It's sometimes two

20   bytes.  So a byte is not a character.  A character is data.

21   It's data within the file.  And a byte is a unit of memory.

22   And so what they're saying is our -- our invention operates by

23   memory offsets, so byte offsets.

24                  (Demonstrative published.)

25             MR. MARTON:  Now, the examiner said, well, your
```

1    patent doesn't really reflect that in the claim language.

2    They say, "you use broad terms such as 'position' and

3    'location'" so Cassorla's coordinates and their offsets really

4    still read on that.

5                       (Demonstrative published.)

6            MR. MARTON:  So what does Sentius do?  On Slide 38,

7    they amended the claim to look much like, say, Claim 62 now.

8    So now, they say "determining the beginning position address

9    of a source material in an electronic database."  And they cut

10   out the word "location" and they say "starting point address,"

11   and they're saying "address" here to reflect that they're

12   dealing with a memory address and byte offsets from that --

13   from that memory address and that the -- the memory address is

14   the address in the electronic database.

15                      (Demonstrative published.)

16           MR. MARTON:  When they made this amendment, Sentius

17   explained to the patent -- patent office that, you know, we --

18   we had this interview with the examiner, and the examiner said

19   these amendments are sufficient to overcome the prior art.

20   Now it reflects that we're dealing with pure byte offsets.

21   And it says, "Cassorla uses the relative position within the

22   document to fix the position of associated notations."  So

23   "relative position within the document" and then by

24   contrast --

25                      (Demonstrative published.)

 1          **MR. MARTON:**  Excuse me.

 2      By contrast, the claims in Sentius's patent have been

 3  amended to reflect that address "on the electronic database is

 4  determined for the source material image," so what's critical

 5  here is we're dealing with -- we're dealing with an address in

 6  memory, an address in a database.  And that's what our -- our

 7  proposed construction reflects.

 8          **THE COURT:**  All right.

 9      Mr. Seth, response?

10          **MR. SETH:**  Yes, Your Honor.  Several responses.

11      First, let me start by emphasizing that the '720 patent

12  was relinquished and all of its claims were relinquished when

13  Judge Armstrong said that they were indefinite.  The claims

14  were rewritten and issued as the '633 patent claims, the ones

15  that are at issue.

16      Why is that important?  Because Mr. Ryan is trying to use

17  the prosecution history from a completely different patent,

18  completely different claims, with completely different claim

19  terms.

20      If I may share my screen, I want to put up the actual

21  claim term that was at issue in the '720 patent because this

22  is very important.

23      Are you seeing Slide 92, Your Honor?

24          **THE COURT:**  I am.

25                  (Demonstrative published.)

1          **MR. SETH:**  Okay.  Thank you.

2          **THE COURT:**  And as part of this, can you explain to

3     me why you added the word "address" as opposed to just "pure

4     byte offsets"?

5          Go ahead.

6          **MR. SETH:**  Yes, I -- I will -- I will get to every

7     point, Your Honor, but I just want to mention, because I think

8     it is important, that in the claim of the '720 patent, and

9     part of the -- the -- the problem that Judge Armstrong had was

10    that it was a source material image stored in electronic

11    database.  And everything that was in this claim, like in 8.2,

12    "cutting the source material image," and in 8.1, "determining

13    the beginning position address of the source material image in

14    the electronic database," and then in 8.7, "converting the

15    address" -- I'm sorry -- yeah, "converting the address of the

16    discrete portion to an offset value from the beginning

17    position address of the source material image."

18         So "image," "image," "image," "image."  This is one of the

19    substantive changes that was made in the '720 patent, and it

20    makes a difference because what we're talking about in the

21    '633 patent is the actual source material.  So what we're

22    talking about is the text in the document once you open the

23    document up and start editing on the document.

24         The "source material image" is what is shown on -- in

25    contrast is what's shown on the screen that the user is

```
 1    allowed to interact with.
 2        Now, with regard to the -- the prosecution history
 3    itself --
 4                    (Demonstrative published.)
 5          MR. SETH:  -- I think it's important -- let me
 6    just --
 7                    (Pause in the proceedings.)
 8          MR. SETH:  Sorry, Your Honor.  Just one second while
 9    I locate the slide I'm -- we're a little out of order here.
10          THE COURT:  Well, I gave you a heads-up on that
11    before.
12          MR. SETH:  No criticism, Your Honor.
13          THE COURT:  I don't think I have the reexamination
14    filings, do I?
15        And is there some reason why they weren't given to me in
16    terms of whether or not there was a disclaimer or not?
17          MR. SETH:  Well, because, Your Honor, there -- the --
18    the -- Zoho has taken the disclaimer position they have not
19    made any disclaimer argument with regard to the actual '633
20    prosecution history.  This is specifically coming right out of
21    the '720 prosecution history, as I said.
22        And -- and so that's I believe why you -- you don't have
23    that.  They're not making any argument from the '633
24    prosecution history.
25        But I --
```

```
 1           THE COURT:  No, I meant the 7 -- well, all right.

 2      Mr. Marton?

 3           MR. MARTON:  Sure.  Mr. Seth, could you actually

 4      bring up your Slide 92?

 5           MR. SETH:  Yeah.

 6                (Demonstrative published.)

 7           MR. MARTON:  Thank you.

 8      I have a couple quick points to make.  So the -- the file

 9      history from the '720 -- that's a parent application to the

10      '633.  That is part of the prosecution history for the '633.

11      That is as much a part of the file history for the '633 as

12      anything.  It's part of the intrinsic record, and it is

13      important and relevant to understanding the '633.

14      Now, in terms of Mr. Seth's argument that the Claim 8 at

15      issue here in the '720 parent application, that being

16      meaningfully different than the '633 claims, that's just

17      fundamentally not correct.

18      These claims map almost exactly to the claims in the '633

19      patent.  There is this -- this difference that Mr. Seth

20      pointed out that the "determining the beginning position

21      address of a source material image" is different than the

22      "textual source material" that is in the '633 claims.

23      Now, why is there that difference?  Well, it's because in

24      the *Flyswat* litigation, the reason that the '720 patent was

25      invalidated is because if you look at Claim 8.1, it says
```

1      "determining the beginning position address of a source

2   material image stored in an electronic database, the source

3   material image including a plurality of discrete pieces."

4      Now, if you jump to 8.2, "cutting said source material

5   image into said discrete pieces."

6      So the court determined that this was an ordered series of

7   steps, but that the cutting was happening after the source

8   material image was already cut up.  And that was a logical --

9   (distorted and unintelligible) -- and -- (distorted and

10  unintelligible) --

11             THE COURT:  Mr. Marton?

12             MR. MARTON:  Yes.

13             THE COURT:  You're -- you've broken up, so I need you

14  to just repeat that last sentence, please.

15             MR. MARTON:  Okay.  So in the *Flyswat* litigation,

16  the --

17             THE COURT:  You were talking about cutting.

18             MR. MARTON:  Oh, I was talking about cutting.  Okay.

19      So the "determining beginning position address of source

20  material image stored in electronic base [sic], including a

21  plurality of discrete pieces," so this -- this source material

22  image that's in the electronic database has discrete pieces

23  already.

24      And then in 8.2, it says, "cutting said source material

25  image into said discrete pieces."  The court in the *Flyswat*

1   litigation determined -- and -- and, frankly, Sentius has

2   agreed in all its litigations that this is an ordered sequence

3   of steps so they happen in order, determining first, cutting

4   next, determining next.

5       And what the *Flyswat* court determined was, well, if the

6   source material image already has discrete pieces, why then is

7   it cutting said source material image into said discrete

8   pieces later?  And it said this is illogical, doesn't make

9   sense, and fails to comply with 101 utility requirement; also

10  fails to comply with certain requirements under 112.

11      Now, in the reissue, what Sentius did was they changed

12  "source material image" just to be "textual source material"

13  so that it's different than the image later.  So the textual

14  source material is what's fed into the system.  It's what

15  comes from the publisher.  It's fed into the system.  It's

16  then cut into pieces, and then it's reassembled to create the

17  image.

18      So basically the '633 is the same as the '720 claims.

19  It's just -- fixes the problem with certain language that was

20  pointed out by the *Flyswat* court.

21          **THE COURT:**  Okay.  Back to my -- back to my question,

22  which is, is the reexamination filings relevant?  And if they

23  are, shouldn't I have them?

24          **MR. MARTON:**  So if you're referring to the

25  reexamination filings, the filings from the reissue, there was

1     not anything particularly relevant there.

2         I thought that the -- the most important statements and

3     the ones that gave most clarity as to what the actual

4     invention meant were from the parent prosecution history, that

5     is, the '720 patent prosecution history and then also from the

6     *Flyswat* litigation.

7             **THE COURT:**  Okay.

8         Let me go back to Mr. Seth.

9         Go ahead.

10            **MR. SETH:**  Thank you, Your Honor.  I guess I have the

11    screen.

12        So I think it's important that we go back to basic claim

13    construction principles.  Mr. Ryan [sic] acknowledged that

14    these claims are different from the claims that are actually

15    at issue and that -- with regard to the claim terms that are

16    actually at issue, one of which is not "source material image

17    stored in electronic database," nor is "cutting source

18    material image," none of those are at issue.  These are not

19    terms in the '633 claims.

20        And -- and so I think we need to go back to the -- the

21    fundamental argument that -- that Zoho is making with regard

22    to Cassorla.  Now, there's -- has to be a clear disavowal of

23    claim scope.  That's claim construction law 101.  It's their

24    burden to show a clear disavowal of claim scope.  And what

25    they're trying to do is take the -- the use -- the undisputed

1    use of the term "byte offset" in the '720 prosecution history

2    and say that this is -- this is a clear -- this is a clear

3    reference to a memory location.

4        And in order to do so, first, they make a technical error.

5    They say that a byte is only a store -- a unit of memory,

6    which is it's not.  It's a unit of data.  And -- and we know

7    this because characters are encoded in bytes of data.

8        So if you -- you have a coding scheme that's a one-byte

9    coding scheme per character, then you're going to have eight

10   bits of data that encode a character.

11       If you got a 2-byte scheme, you'll have 16 bits.  If you

12   got a 3-byte scheme, you'll have 24 bits.  But these are not

13   just simply memory locations.  These are units of data set.

14   So I wanted to correct that.

15       Now, I want to go to Cassorla, and I believe I've located

16   the slide I wanted to show you earlier.

17                    (Demonstrative published.)

18       **MR. SETH:**  So in Cassorla -- and let me go to my

19   Slide 14, and then I'll go to Slide 13.  In Cassorla --

20       **MR. MARTON:**  Excuse me.  I need to interject.

21   Actually, this is from Zoho's technical tutorial, not supposed

22   to be used in claim construction.

23       **THE COURT:**  I --

24       **MR. SETH:**  I believe that there were several slides

25   that Mr. Ryan just used from his tutorial including the slide

1  he showed us on Slide 29.  I'm just rebutting that.

2         **THE COURT:**  I saw something similar --

3         **MR. MARTON:**  Okay.

4         **THE COURT:**  -- from you, Mr. Marton.

5         **MR. MARTON:**  This was not a slide that I -- I used

6  something similar.  This is a slide from our technical

7  tutorial.  My understanding is it wasn't supposed to be used,

8  but that's fine.

9      Go -- go ahead.

10        **MR. SETH:**  Well, Mr. -- Mr. Ryan's [sic] Slide 29, I

11 believe it was, showed us the way the Cassorla was showing --

12 using various points in the -- or tags in the document, I

13 should say, for headers and -- and chapters and paragraphs and

14 words.  And the applicant was certainly distinguishing his

15 patent from Cassorla.  That's undisputed, but by -- by saying

16 that we're using pure byte offsets.

17     And as Dr. Weissman was explaining and -- in showing

18 this -- this example of "down the rabbit hole" is that each

19 one of those boxes is a character position.  And in the '633

20 patent, it -- you're counting those character positions all

21 the way down to "remarkable."

22     So they -- if -- and I don't know.  I haven't counted

23 these boxes, your Honor.  But let's just say "remarkable"

24 started at box 101, okay, or character position 101.  And the

25 character position is an offset, that -- where the "C" is in

 1    Chapter 1, that's zero.  That -- and in that case, it's not a

 2    blank character.  It's a -- it's the character "C."  That's

 3    the first position.  And you're counting all the characters

 4    down to "remarkable."  So if "C" is the zero character

 5    position, the first character position may be assigned a 0

 6    logical address.  And the --

 7            **THE COURT:**  I'm going to stop you 'cause we went

 8    through this on the tutorial.  The question is --

 9            **MR. SETH:**  Yeah.

10            **THE COURT:**  -- not that basic premise.

11            **MR. SETH:**  Okay.

12            **THE COURT:**  The question is what does the patent say.

13    And the argument needs to focus on why I should use the word

14    "character" in a construction given the patent and -- and the

15    intrinsic record.

16            **MR. SETH:**  Sure.

17                    (Demonstrative published.)

18            **MR. SETH:**  Through -- through -- throughout the

19    patent -- and -- and let me -- actually, let me just put up

20    one slide.

21                    (Demonstrative published.)

22            **MR. SETH:**  This is from -- this is not from the

23    tutorial but this is from the supplemental Weissman

24    declaration this was docket 63-2, Exhibit 1 to the

25    supplemental Weissman declaration.  And characters form the

1    basis of all text data processing.  This is undisputed.

2       The -- the issue here is whether there was a clear

3    disclaimer when the applicant used "byte offset" given that

4    the only -- the specification showed that all the offsets are

5    positional offsets from the beginning of text.

6       This is from the '633 patent at column 7, lines 30 through

7    49 at -- repeatedly the position offsets are from the

8    beginning of the text.

9       And the reason that we're doing that is because when we --

10   when the user wants to click on a word that has some

11   additional information linked to it, in the '633 patent, they

12   get to click anywhere on that word, on any character in that

13   word, they can right click it and get to whatever it --

14   information it's linked to that word is linked to.

15      And so the patent is explaining that when the user clicks

16   within the text image, the -- the text on the screen, the

17   location of the pointer is determined and converted to a

18   position offset from the beginning of the text, so -- and that

19   is why, Your Honor, we're -- we're saying that.

20      It's in the claims itself based on the -- the beginning

21   position address, determining the beginning position address.

22   And the reason that we're doing that is because we're going to

23   be determining starting point addresses and ending point

24   addresses of each of plurality of the discrete pieces.  The

25   plurality of the discrete pieces are the words in -- the --

```
 1    the character strings I -- I loosely defined --

 2              THE COURT:  Well, that's --

 3         MR. SETH:  -- defined as "words" in the electronic

 4    database.  And they're -- and those are going to be measured

 5    as an offset from the beginning position address.

 6              THE COURT:  Well, let's -- that's a good segue.

 7       Let's -- let's go the "starting point address" and "ending

 8    point address."

 9              MR. MARTON:  Could I make one rebuttal argument to

10    Slide 9?

11              THE COURT:  Quickly.

12              MR. MARTON:  Sure.

13       Mr. Seth, could you bring up Slide 9 in full?

14       So Mr. Seth points to --

15                    (Demonstrative published.)

16              MR. MARTON:  -- this language in column 7 regularly,

17    this language at line 33, "When an image is created, the cuts

18    are indexed based upon position offset from the beginning of

19    the text."

20              THE COURT:  Okay.  Mr. Marton, I still have a --

21              MR. MARTON:  Yes.

22              THE COURT:  -- court reporter.

23              MR. MARTON:  Okay.

24              THE COURT:  And the same rules apply.  When people

25    start -- lawyers start reading, they read very fast.  And just
```

1   because we're on video and not in the courtroom doesn't mean

2   that that rule changes.

3        **MR. MARTON:**  Yes, Your Honor.

4        Okay.  So this language at line 33 of column 7 of the '633

5   patent that says, "when an image is created, the cuts are

6   indexed based upon the position offset from the beginning of

7   the text," this is the planning that Mr. Seth and Sentius rely

8   on heavily to support the notion that there is a character

9   offset.

10       There's no reference to it, a "character position offset"

11  here or anywhere else in the specification.  This admittedly

12  is not very clear.  This language is not very clear what is

13  meant by the "position offset from the beginning of the text."

14       Now, we look to the file history, as I've gone over

15  multiple times -- to -- to get more clarity where there are

16  very, very clear statements about what that offset means.  And

17  it is a byte offset.

18       And Sentius contends, well, those byte offsets are the

19  same as character offsets, but the patentee did not say

20  "character offsets," and a byte is not the same as a

21  character.  A byte is a unit of measure in memory.  It is --

22       **THE COURT:**  I --

23       **MR. MARTON:**  -- eight bits.  It's like a liter, and

24  you could fill a liter with milk or you could fill it with

25  water.

1          Now, a byte could be filled with a character or it could

2     be filled with other data, so they're two very different

3     things.  And what Sentius is trying to do is morph this into a

4     measurement of data rather than a measurement of memory.

5          But the patent file history couldn't be more clear, that

6     this is all about a beginning position address in a database

7     and then byte offsets, which are measurements of memory, from

8     that beginning position address.

9          And that's all I have to say.  Thank you.

10          **THE COURT:**  All right.  Let's go ahead and move on to

11     "starting point address" and "ending point address."  As I

12     said, I thought it was a good segue because, again, Sentius

13     here is focused on character position, and Zoho is focused on

14     this kind of offset value -- this -- you know, it seems to me

15     that the debate that we were just -- I was just hearing from

16     you -- or, actually, which also segues to the next term,

17     "offset value," all of these are all related.  And so I think

18     in many ways, it's going to be -- arguments are probably the

19     same.  But I'll let you -- I'll let you go ahead and have the

20     argument.

21          One of the things that you should know is that I do look

22     at consistency in all disputed terms across the patent,

23     especially when I have to instruct the jury on these topics --

24     so to the extent that that's helpful when you're thinking

25     about your argument.  All right.

 1       Is there anything different?  I'll ask you, Mr. Seth, is

 2    there anything different here really with respect to the

 3    arguments that the address -- the starting point address is --

 4    is that character position from what you've been arguing?

 5            **MR. SETH:**  No, Your Honor.  I don't think that there

 6    is.  I think Your Honor's a hundred percent correct.  These

 7    are all related terms.  You have some reference position, and

 8    you're going to be measuring the -- the offset from that

 9    reference position.

10       We do propose that these are the starting and -- or the

11    starting and ending character positions of a word.  I think

12    that is a hundred percent consistent with the field of this

13    invention, the disclosure of the patent, the use of "position

14    offsets" throughout the patent.

15       And I think problem with Zoho's construction here is that

16    they're using -- they're trying to propose that the starting

17    address and ending address be defined by "offset value."  And

18    what they're -- and -- and I don't know that that's -- I think

19    defining one claim term by another claim term is not

20    necessarily helpful to a jury, which I think is the purpose of

21    this process.  And I think that --

22            **THE COURT:**  Well, I mean -- I'm going --

23                 (Simultaneous colloquy.)

24            **THE COURT:**  I'm going to interrupt you.

25       I mean, what they argue the offset value is -- and all of

1     these things build, right, are the distance in bytes from the

2     beginning point.  I mean, again, remember, a patent's supposed

3     to teach something, right?  And if you are teaching how to

4     make this -- the technology work in an electronic context,

5     there is some merit to what it is they're arguing; that is,

6     that there's some value or there's some distance, right?  You

7     used the word "value".  They use the word "distance."  It's

8     what I'll figure out here.

9         But it's not necessarily a bad thing to say, this is how

10    one's term is defined and then to use that term in a layered

11    approach, right, to understand how the patent is working.  You

12    do the same thing.

13        So -- I mean, both of you define "offset value."  You

14    know, query whether that even needs to be defined, but maybe

15    it does.

16            MR. SETH:  That's not a -- a bad point, Your Honor.

17    I mean, I think we're -- we're in agreement that it's a

18    distance from whatever the beginning position address is, the

19    offset value is a value that measures the distance or the

20    distance between the two -- or the difference between two --

21    two addresses.

22        The -- the -- the fundamental problem that -- and maybe

23    this -- you know, maybe this is a draw, but the -- they're --

24    the -- they're saying that it's a -- clearly a memory address.

25    And they're saying that it's clearly a memory address because

 1    they're making the proposition that a byte is just a unit of

 2    storage, which is not a correct statement of fact.

 3        And secondly, the -- it's a unit of data as well as a unit

 4    of store -- storage.

 5        And there's no dispute that these are electronic

 6    addresses, but the question is the -- the claim doesn't use

 7    the word "byte offset."  The patentee used the word "byte

 8    offset" in the prosecution history.  They're saying this is

 9    clearly a memory address and that that is our fundamental

10    proposition or fundamental dispute.

11        Now, we believe, Your Honor, that -- that anybody of

12    ordinary skill in the art would know that the position from

13    the beginning of the text, which is throughout the

14    specification, is the character position, because whether it's

15    one byte or many bytes, each byte encodes a character.

16        You know, whether it's two bytes or a one-byte scheme or

17    three-byte scheme, the bytes encode characters.  And all word

18    processing is based on characters.  And the point that -- that

19    Sentius was making in connection with Cassorla is that you can

20    just count the bytes that encode the characters and -- and you

21    don't have to use some reference scheme in Cassorla.

22        And this allowed the -- the -- the '633 patent to be used

23    with the existing functionality of visual editors.

24        So I -- I don't think that there's anything else --

25    you're -- you're correct, Your Honor.  Other than this

```
 1    fundamental dispute, there's not really a separate dispute

 2    about starting and ending point addresses.

 3            THE COURT:  You define "offset value" as a value from

 4    a beginning point.  Would you also define it as a -- somehow a

 5    character position?

 6            MR. SETH:  Yes, Your Honor.  We --

 7        So first of all -- and I don't -- am I not -- I don't

 8    think I'm still sharing the screen.  Let me just -- if I may.

 9            MR. SETH:  Are you seeing my Slide 23, Your Honor?

10            THE COURT:  I am not, but I can --

11            MR. SETH:  Oh, I'm sorry.

12                    (Demonstrative published.)

13            MR. SETH:  Believe now you are.

14            THE COURT:  Yes.

15            MR. SETH:  Okay.

16        So, Your Honor, we've already accepted a value or

17    distance.  This was a previously construed term in the

18    Blackberry case, and it was defined as a value from the

19    beginning point.

20        Zoho had a problem with the value.  They didn't think that

21    was helpful enough, so they had distance.  We're okay with

22    distance from the value or distance from a beginning point.

23    And I don't know if that answered your question.

24            THE COURT:  Okay.  That's helpful.  Thank you.

25        All right.  Then Mr. Marton?  Claim --
```

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 565-7228

 1          **MR. MARTON:**  Yes.

 2          **THE COURT:**  -- Claims 2 and 3, again, I think that

 3     all of these kind of overlap together.

 4        Is there more that you want to say on this?  And what

 5     about this notion of whether we even need to define "offset

 6     value"?  Is there a plain and ordinary meaning, especially in

 7     light of your own constructions?

 8          **MR. MARTON:**  Sure.  So --

 9                    (Demonstrative published.)

10          **MR. MARTON:**  -- to "starting point address" and

11     "ending point address," I agree that the arguments here are

12     directly tied to the arguments about "beginning position

13     address."

14        The one issue I would like to just restate, and I think --

15     I think I've said it before, but I have recognized --

16          **THE COURT:**  I'll just remind you, if you've said it

17     before, you may not want to waste time saying it again.  Your

18     time is limited.

19          **MR. MARTON:**  Okay.  It's addressing a comment that

20     you made directly before these terms.  And it was about

21     consistency across use of terms within the claims.

22        And I -- I recognize that describing the -- the first

23     instance of "address" as "an address in a database" and then

24     the second and third instances of "address" as an "offset

25     value" is a bit odd.  The reason we have to do this, it's

 1    because it's what the patent tells us.  If we look at

 2    Figure 2 --

 3                  (Demonstrative published.)

 4         MR. MARTON:  -- and the associated language to

 5    Figure 2, it says that the beginning position address and the

 6    ending position address, though it doesn't use the term

 7    "address."  "Address" is not actually in the specification,

 8    but what it says is that these beginning position and ending

 9    position of the cut words are offset values.

10         And so we're getting that "offset value" language directly

11    from the spec.  It's the only discussion of what is in

12    Figure 2.  It is the only explanation of what the "starting

13    point address" and "ending point address" is.

14         Now, in terms of the definition of "offset value," I do

15    think that we need --

16                  (Demonstrative published.)

17         MR. MARTON:  -- a -- a construction here.  And the

18    reason is the file history.  In the file history, as we've

19    said multiple times, Sentius made very clear that they're

20    dealing with byte offsets, pure byte offsets.  Over and over

21    they said in prosecution, the claimed invention operates on

22    pure byte offsets.  And --

23                  (Demonstrative published.)

24         MR. MARTON:  -- these offsets are off of the address

25    on the electronic database.

1      To make the -- the claims adhere to what was said in the

2  prosecution history, we have to construe -- we have to

3  construe "offset value" --

4                  (Demonstrative published) --

5      **MR. MARTON:**  -- to be a distance in bytes from the

6  beginning point.

7      Now, there's been this discussion by Sentius that there

8  wasn't a -- a clear disclaimer.  We disagree with that.  There

9  was a very clear disclaimer.  But even second to that, absent

10  a clear disclaimer, the prosecution history is always relevant

11  to construction.  And there does not need to be a clear

12  disclaimer for -- to inform one skilled in the art what the

13  invention is about.

14      And I -- I believe that statements made in the context of

15  distinguishing Cassorla were unequivocal and very clear that

16  what we're dealing with when we're talking about Sentius's

17  invention is pure byte offsets.

18      So that's why I think we need a construction of that term.

19  Otherwise, I actually agree that there is, you know, a general

20  meaning for an offset value.  It's just clearly changed by --

21  by Sentius.  And -- and one --

22      **THE COURT:**  I -- I -- go ahead.

23      **MR. MARTON:**  One final point.  Mr. Seth mentioned

24  that their construction comes from the *Blackberry* litigation.

25  Well, that was an agreed construction at the point of

```
1    settlement.  There was a claim construction hearing, no ruling

2    from the court.  And then before -- before a ruling came from

3    the court, the parties settled and issued a stipulated set of

4    constructions.

5              THE COURT:  I see.

6              MR. MARTON:  So I put no value on that.

7              THE COURT:  So a couple questions.  If I used Zoho's

8    construction and told the jury that a starting point address

9    was an offset value from the beginning position address to the

10   starting point --

11             MR. MARTON:  Um-hmm.

12             THE COURT:  -- and then told them that the offset

13   value meant a distance in bytes from a beginning point --

14             MR. MARTON:  Um-hmm.

15             THE COURT:  -- I think they would be entirely

16   confused.

17             MR. MARTON:  I think it would be confusing absent

18   more explanation, but I -- I think we could make it quite

19   clear with a simple graphic.

20             THE COURT:  But you're --

21                   (Simultaneous colloquy.)

22             THE COURT:  But you're saying that the value is from

23   a -- in one, you say that the value is -- it's an offset value

24   from a beginning position address, and then -- but it's all --

25   I would have to say "a starting point address is the distance
```

```
 1    in bytes from a beginning point --"

 2              MR. MARTON:  Um-hmm.

 3              THE COURT:  "-- from the beginning position address

 4    to the starting point"?

 5              MR. MARTON:  Um.

 6              THE COURT:  So you see what I'm saying?

 7              MR. MARTON:  I do.  I do.

 8              THE COURT:  If I took out -- if I took out -- if I

 9    used your construction and substituted --

10              MR. MARTON:  Um-hmm.

11              THE COURT:  -- what you are describing as the

12    definition of "offset value" and put your definition in there,

13    it doesn't really make sense.

14              MR. MARTON:  Okay.  I -- I actually -- I see the

15    issue.  And I appreciate you calling it out.  One -- one

16    solution is to modify Zoho's construction for "starting point

17    address" and "ending point address" and say --

18                   (Demonstrative published.)

19              MR. MARTON:  -- "a distance in bytes from the

20    beginning position address to the starting point."

21              THE COURT:  Okay.

22              MR. MARTON:  And that -- that would solve it.  And

23    then we have --

24              THE COURT:  Hold on.  Let me -- I'm just going to --

25    I'm going to make a note.
```

1          MR. MARTON:  Okay.

2          THE COURT:  "The distance in bytes" -- all right.  Go

3    ahead.

4          MR. MARTON:  "From the beginning position address to

5    the starting point."

6          THE COURT:  Okay.

7          MR. MARTON:  And then we do the same, you know, for

8    the ending character, but -- for the "ending" --

9          THE COURT:  Right.

10          MR. MARTON:  -- "point address."  And that would

11   solve it.  That's a good point.  And I'm -- now that you've

12   pointed out, I regret not harmonizing that way.  I was

13   actually -- thought I was making it more simple but clearly

14   was not.

15          THE COURT:  In the -- let's see -- January and May

16   1996 in the remarks, this is to Sentius, the remarks add the

17   word "address" but not "pure byte offset."  Should I take

18   any -- should I take anything away from that particular remark

19   to both of you?

20          MR. SETH:  Yes, Your Honor.  You -- you should,

21   because, as you correctly point out, the claim does not say a

22   "pure byte offset."  The words of the claim are an "offset

23   value."

24          And -- and let me just correct the record, Your Honor.

25   Judge -- Judge Payne in the *Blackberry* case did construe

1   "offset value."  And let me give you the quote.  It was in the

2   preliminary construction, and it was "a value from a beginning

3   point."  Okay?

                    (Demonstrative published.)

4

5       MR. SETH:  That was an actual construction issued by

6   Judge Payne in his preliminary constructions.

7       But going back to it, you're -- you're a -- you're a

8   hundred percent correct that -- that the claim doesn't use --

9   it use -- uses the term "offset value."  And the problem is

10  that they want to replace that with "byte offset."  And

11  they're saying that there's -- and -- and what's worse is that

12  they're saying that "byte offset" is some kind of memory

13  location, when, in fact, a "byte offset" is a -- a unit of

14  data, and as we're -- and as we're saying, it's a -- it's a

15  character position.

16      So if I may, I'd just like -- I have two slides I just

17  want to use to --

18          THE COURT:  But, you know, it's interesting, right?

19  And, again, this brings back to the beginning.  The --

20  "character" isn't a term that -- well, you both want to -- you

21  both want me to use something else.  Right?  That is, you want

22  it defined as a "character."  They want it defined as a "byte

23  offset."  We've gone through this, right?

24          MR. MARTON:  Yes, Your Honor.

25          MR. SETH:  Yes, Your Honor.  But I do want to

1    emphasis that they are further -- and the problem that they're

2    having and if -- if I may, just one slide, Your Honor.

3           THE COURT:  That's okay.  Your time's limited, so --

4         MR. SETH:  Well, this is the statement on Slide 28,

5    "pure byte offsets."  And the problem is, is that -- and -- is

6    that they may -- they may be at trial tempted to say that

7    these are limited to memory locations or physical storage

8    locations, but this -- the --

9           THE COURT:  And, look, I've got -- I've got another

10   case with you against Apple so I don't really care what

11   they're going to say at trial.  The question is what is the

12   patent teaching.  That's the issue.

13          MR. SETH:  Right.  And the patent is teaching that

14   it's a position offset.  And the -- and the patentee, with

15   regard to another claim that is not at issue here, argued that

16   Cassorla had a different teaching, which it does.  But the

17   difference in the teaching is as we are describing.

18      So it -- it doesn't -- their proposed construction is

19   defining "offset value" as a "byte offset."  And -- or

20   distance in bytes from the beginning point.  You said, how is

21   the jury going to understand what that means --

22          THE COURT:  Let me --

23          MR. SETH:  -- and --

24          THE COURT:  Finish off.

25          MR. SETH:  This is -- this is the issue, because

 1    then -- then they're trying to say that this is a memory

 2    location, and --

 3            **THE COURT:**  Who is the person of ordinary skill in

 4    the art for these patents?

 5            **MR. SETH:**  I'm sorry?

 6            **THE COURT:**  Who is the person of ordinary skill in

 7    the art for these patents?

 8            **MR. SETH:**  Somebody who works with designing word

 9    processing applications.

10            **THE COURT:**  And what would that be?  What would the

11    art be?

12            **MR. SETH:**  Word processing -- visual editors and word

13    processing applications, is the art.

14            **THE COURT:**  So no computer science degree.

15            **MR. SETH:**  Computer science degree would be helpful.

16            **THE COURT:**  Do you not have a definition?

17        How about you, Mr. Marton?  Who's a person of ordinary

18    skill in the art?

19            **MR. SETH:**  I believe he's muted.

20            **MR. MARTON:**  My apologies.  I thought I was unmuted.

21        Yes, I'm pulling it up.  We -- we have a definition in --

22    here we are.

23            **THE COURT:**  And remind me of the year.

24            **MR. MARTON:**  So in -- for the '633, it's '94.  So

25    looking at document -- or Docket 53, page 5 and page 6, which

1    are the declaration from Zoho's expert John Weissman, he has

2    opined that a person of ordinary skill in the art would have

3    at least a Bachelor's degree in computer science or a related

4    field or the equivalent work experience in computing operating

5    systems, programs and databases, with some experience with

6    graphical user interfaces.

7              **THE COURT:**  Do you agree, Mr. Seth?

8              **MR. SETH:**  Yes, Your Honor.

9              **THE COURT:**  Okay.

10             **MR. SETH:**  May I give our description of a person of

11   ordinary skill?

12             **THE COURT:**  Yes.

13             **MR. YORIO:**  It's in paragraph 58, Dr. Madisetti's

14   declaration.

15             **THE COURT:**  Could I have a docket number?

16             **MR. YORIO:**  Document 51 at page 20.

17             **THE COURT:**  Okay.

18             **MR. YORIO:**  And he says, "a person of ordinary skill

19   in the art in this time frame," which is 1994, "would have

20   been someone with at least a Bachelor's degree in computer

21   science, electrical engineering, or related discipline and two

22   to four years of experience."

23             **THE COURT:**  Okay.

24             **MR. YORIO:**  "Alternatively, a person of ordinary

25   skill in the art may have been someone with an advanced degree

```
 1    in computer science, electrical engineering or related
 2    discipline."  It's paragraph 58.
 3           THE COURT:  All right.  Thank you.
 4       I mean, it just occurred to me, right, that that's
 5    obviously an important topic because this is teaching
 6    something, again.  It's not theoretical in that sense.  It's
 7    trying to teach something to individuals.  And it's 1994.
 8    Right?
 9       Today, there are programs that allow -- I mean, when my
10    kids were young, I sent my kids to camp, and they learned how
11    to design web pages, right.  So back in the day, kids couldn't
12    design web pages.  Today, they design them better than adults.
13       So, you know, the -- it matters what is -- who we're
14    trying to communicate with.  Right.
15       But I think we need to just move on here.  So let's move
16    to four, "image of source material and source material image."
17       It looks like, you know, what I'm seeing here is Sentius
18    believes that it is the -- I mean, the first part of both your
19    constructions are the same, that is, "an image displayed on a
20    computer screen derived from," and then that's where you
21    change.  So Sentius wants it to be "derived from the source
22    file," and Zoho wants it to be "derived from the text created
23    by reassembly of the cut pieces of" -- either source
24    material -- I'm assuming "textual source material," right?
25           MR. MARTON:  That -- that is correct, "textual source
```

```
 1    material."
 2            THE COURT:  "Of textual source material."  Okay.
 3        Why don't we start with Zoho on this one.
 4            MR. MARTON:  Okay.
 5        I will share my screen.
 6                    (Demonstrative published.)
 7            MR. MARTON:  Okay.  So Zoho's construction comes
 8        directly from the specification here at -- I'm looking at
 9        Slide 56, column 7, lines 22 through 29.  It describes the
10        compilation step.  And it says, "during text" -- "during
11        compilation, the cut text is reassembled to create an image of
12        the text that the end-user sees."
13        This is the only discussion with of an image of the text.
14        And so Zoho's construction comes from that.
15                    (Demonstrative published.)
16            MR. MARTON:  This is consistent with what the Flyswat
17        court interpreted the "source material image" to mean, not for
18        the -- so one of the issues in the Flyswat court was "source
19        material of images" we showed before was used in multiple
20        places.  And they actually gave different constructions to it
21        in different places because they couldn't make them work
22        together.
23        So in the first instance, the source material image was
24        treated as the -- the data as input to the system.  But then
25        for the later instances of it, the -- the court construed
```

1    "source material image" to mean "an image displayed on a

2    computer screen derived from the text created by means of

3    linking and reassembly of the cut species from the souther

4    material."

5       Now, I thought that was an overly complicated construction

6    so took out the "linking" part and just proposed a

7    construction that really followed what was said in column 7,

8    which is that the image is something that's created from

9    reassembly of the cut pieces.

10      So that's pretty much it.  I think it's pretty

11   straightforward.  I think one skilled in the art would review

12   the patent and pretty quickly understand that the images is

13   the reassembled cut pieces.

14      The problem with Sentius's construction is it's general.

15   It just says an image of the text that's derived from the

16   source material in any way, but -- but the patent makes clear

17   the only instance of an image that's described is that which

18   is created from the reassembly of the cut pieces.

19            **THE COURT:**  All right.

20      Mr. Seth, are you doing this one?

21         **MR. SETH:**  Yes, Your Honor.

22      Let me just take the screen if I may.

23                (Demonstrative published.)

24         **MR. SETH:**  So, Your Honor, as Mr. -- Mr. Marton

25   points out, they have in their claim construction that this

1    image is created by the reassembly of the cut pieces, and this

2    is a -- a violation of claim differentiation, for one, because

3    the claim -- the claim language does not specify how this

4    source material image is -- is -- is formed.  The compiling

5    step and the means for compiling are not in any independent

6    claim of the '633 patent.

7         They are only in dependent Claim 19 and dependent Claim

8    103.  Dependent Claim 19 depends from independent Claim 17.

9    Dependent claim 103 depends from independent Claim 101.  Those

10   steps do not have the compiling step or the means for

11   compiling.

12        So what they're -- they're doing is violating *Phillips*,

13   415 F.3d at 1314-15, basic claim differentiation law,

14   limitations in dependent claims are presumed not to be in

15   independent claims and that is a --

16             **THE COURT:**  Well --

17        **MR. SETH:**  -- fundamental problem.

18             **THE COURT:**  Okay.  One quick question for you.  Do

19   you make a distinction at all between the phrases "discrete

20   pieces" and "discrete portions"?

21        **MR. SETH:**  "Discrete pieces" are -- are -- and this

22   goes to the difference between Claim 8 and the asserted

23   claims.  The "discrete pieces" are the words in the document,

24   and the "discrete portions" are the image of those words on

25   the screen.

1          **THE COURT:**  Okay.  Next?

2      Yes?

3          **MR. MARTON:**  Should we move to the next term?

4          **THE COURT:**  All right.  Next, I have as the lookup

5      table.

6      Mr. Seth, why don't you start this one?

7          **MR. SETH:**  Absolutely, Your Honor.

8              (Demonstrative published.)

9          **MR. SETH:**  So the -- the problem with the Zoho

10     construction is that it ignores a couple of things.  One, it

11     ignores what one of ordinary skill in the art understands a

12     lookup table to be, which is a data structure that contains

13     values for searching.

14     They propose to limit the term --

15         **THE COURT:**  It -- can I ask just a basic question?

16     Is a dictionary a table?

17         **MR. SETH:**  A dictionary is not an electronic, first

18     of all -- I mean, if you're talking about a physical

19     dictionary.  We're not talking about something that's on

20     paper.  We are talking about an electronic data structure for

21     sure.

22     And -- and it -- and it has to be structured so that you

23     can put in a value and then obtain some additional information

24     that is stored in the data structure and that you're looking

25     up.

 1              **THE COURT:**  I -- so --

 2                     (Simultaneous colloquy.)

 3              **THE COURT:**  We're trying to -- I mean, I -- an

 4      electronic dictionary, is that a table?

 5              **MR. SETH:**  An electronic dictionary would be a table

 6      if you can input something and then get out something.

 7          If -- if there's -- if there's a output from the input and

 8      the output is stored in the data structure, that is a lookup

 9      table.

10          And the -- the Zoho proposed construction -- and, again,

11      this is -- this is similar to the byte offset is it's

12      incomplete.  They say "an array or matrix," and then -- but

13      then they don't define what an "array" is or a "matrix" is.

14          And an array, as we see --

15                     (Demonstrative published.)

16              **MR. SETH:**  -- is a data structure that's -- contains

17      a group of elements.

18              **THE COURT:**  I don't have a computer science degree,

19      but even I know what a "matrix" is.

20              **MR. SETH:**  Sure.  But what is an "array"?

21              **THE COURT:**  Well, what's a data structure?  I mean --

22              **MR. SETH:**  A data structure --

23              **THE COURT:**  So let me -- let me ask, is --

24                     (Simultaneous colloquy.)

25              **THE COURT:**  Define a data -- under your definition,

1     define a "data structure" that's not a table.  Tell me what

2     that is.

3             **MR. SETH:**  A data structure that is not a table

4     would -- would -- would be something, for example, where

5     you -- you have to calculate -- you put an input and then you

6     have to calculate an output.  That would not be a -- a -- that

7     would not be a lookup table because you're not looking up

8     something.  That's in the table.

9        So there are data structures that don't have -- that

10    have -- for -- for example, a spreadsheet is a data structure,

11    okay, and it may -- it may not have any values in it.  It may

12    be that you input a value, and then from some equation that

13    you've set up through cells, it will calculate a value.  And

14    calculating a value is not what a lookup table is.  A lookup

15    table is --

16                      (Simultaneous colloquy.)

17            **THE COURT:**  Mr. Seth.

18            **MR. SETH:**  And you -- and you --

19       Let me just finish?

20       And you look up something in the data structure using

21    something else as the input.

22            **THE COURT:**  I don't -- I really don't know what your

23    endgame here is, but I think that you have totally

24    over-complicated this.  Again, I think -- you know, you

25    probably have some -- I haven't looked you up.  You probably

```
 1    have some advanced degree, but if I'm a juror, and I've got to

 2    define -- I have to resolve some dispute where there's a

 3    lookup table, we all have a sense of what a lookup table is.

 4    It's --

 5       I mean, I use tables -- I use tables in this -- you know,

 6    for my -- I have my clerks use tables in my patent cases,

 7    right?  We use tables all the time.  Unless there is something

 8    that is different in the context of computer science in 1994,

 9    I don't know why we would over-complicate this.  So it --

10            MR. SETH:  Your Honor, to the --

11            THE COURT:  And do we even need -- let me ask this as

12    a basic question, do we really need a construction here?

13            MR. SETH:  And -- and, you know, Your Honor, maybe --

14    maybe we don't, given -- given what you just said.  Our

15    problem isn't -- we agree.  Lookup tables are -- are not

16    something complicated.

17            THE COURT:  But your definition is I have to tell

18    you.  It's -- it's very -- you know, "a data structure that

19    contains values for searching or retrieving."  I mean, I --

20    maybe you're right.  I don't know -- and I'll let Mr. Marton

21    talk here.  I don't know.  Maybe an array is too complicated

22    but a matrix of data, I --

23       All right.  Go ahead.  Mr. Marton.

24            MR. MARTON:  Thank you, Your Honor.

25       Mr. Seth, if I could take the screen, that would be great.
```

1            MR. SETH:  Yes.

2            THE COURT:  And tell me why I even need a -- a

3     definition here.

4                    (Demonstrative published.)

5            THE COURT:  Why a jury couldn't figure out what a

6     lookup table is just by its plain meaning.

7            MR. MARTON:  Sure.  I -- I've got two things to say.

8     One, I think we could drop the phrase "array" from this.  "A

9     matrix of data that contains values for searching."  The

10    reason I included "an array" in there was because that is how

11    Sentius itself construed the term in the past.

12       It just seemed easier to argue consistent with what

13    they -- they had agreed to in the past.

14            THE COURT:  Well, and it comes from the desktop --

15    the computer desktop encyclopedia, right?

16            MR. MARTON:  Yes.  Yes.  It is an exact definition

17    from an encyclopedia.  I think it was just easier for argument

18    sake to include the exact definition.  But I agree, it is more

19    clear saying "matrix of data that contains values for

20    searching."

21       Now, the reason I think we need a construction is because

22    just hearing Mr. Seth's arguments, he clearly disagrees with

23    what a lookup table is.  He thinks it's any data structure

24    that has values for searching.  So any database, any data

25    structure, even a document itself.  You just open up a

1    document, that's a data structure, and it has values that you

2    can search.

3        That is not what everyone thinks of as a lookup table.

4    And, you know, we have the definitions from the different

5    dictionaries, and then we also have Figure 2.

6                    (Demonstrative published.)

7            **MR. MARTON:**  And Figure 2 shows us, that's a table.

8    That's a matrix with data for searching.

9        Now, to expand that to be any data structure, which is

10   what I think Sentius wants to do, is inconsistent with the

11   specification -- specification and inconsistent with what one

12   skilled in the art would understand a lookup table to be.

13       So to avoid fights down the line as to whether something

14   in the accused product is a lookup table, I think it's safest

15   to have a construction and -- and, frankly, I think "matrix of

16   data that contains values for searching" would be great.

17           **MR. SETH:**  Your Honor, may I respond?

18           **THE COURT:**  Very briefly.

19           **MR. SETH:**  I -- I just -- the -- the issue, of

20   course, is Figure 2 shows a particular embodiment of a lookup

21   table.  And the -- it is not the only type of lookup table

22   that there is.  Not every -- not every lookup table is a

23   matrix.  It can be an array by -- by definition.  And an array

24   is a data structure is that has the values for searching,

25   groups of elements, you could say.  But I agree it may be too

```
 1   complicated to define this.
 2        THE COURT:  All right.  Let me -- I want to check in
 3   with my court reporter.  We've been going an hour and a half.
 4   And we have just two more in this patent, at which point,
 5   perhaps then we can take a break.  If she can unmute herself,
 6   and let me know if she can do that or she wants to take a
 7   break now.
 8             (Off-the-record discussion.)
 9        THE COURT:  All right.  Great.  Thank you.
10     Let's do the next two, and then we'll go ahead and take
11   break, primarily because I need to give her a break.
12     Okay.
13     So number six, "means for compiling the source material
14   image from at least the plurality of discrete pieces."
15             (Demonstrative published.)
16        THE COURT:  It looks like there is -- really, the big
17   question here is indefiniteness.  Let's go ahead and start
18   with Zoho.
19        MR. MARTON:  Thank you, Your Honor.
20             (Demonstrative published.)
21        MR. MARTON:  So yes, the parties agree that this is a
22   term that is subject to §112 ¶6, it is a means-plus-function
23   term, and the parties also agree that the function is
24   compiling the source material image from at least the
25   plurality of discrete pieces.
```

 1          Now, this is a -- so what we need to do is we need to look

 2     into the specification to find structure for performing this

 3     compilation step.  You know, what is it that is taking the

 4     discrete pieces and turning it into an image.  And the

 5     specification doesn't disclose anything doing that.

 6                    (Demonstrative published.)

 7          **MR. MARTON:**  It just recites that during the

 8     compilation -- and I'm at column 7, line 22 of the '633

 9     patent, "During the compilation, the cut text is reassembled

10     to create an image of the text that the end-user sees."

11          And then below, that it says, "During the compile process,

12     an image of the text is created."

13          Now, what we need here is we need an algorithm or set of

14     steps that explains exactly how this compilation occurs.

15                    (Demonstrative published.)

16          **MR. MARTON:**  We don't have that.  And if we look on

17     Slide 65, what -- what we have here is Sentius's proposed

18     structure.  And they say it's a computer having a visual

19     editor and a user interface programmed to perform the recited

20     function and equivalents thereof.

21          They basically argue that a visual editor would be able to

22     do this and, therefore, there needs to be no disclosure of an

23     algorithm.  But the visual editor -- and this is -- this

24     reaches back to arguments that Sentius has been making

25     throughout the case, that this whole case -- this whole patent

1   is about modifications to a visual editor.  Well, that's

2   fundamentally not true.

3        The patent refers to a visual editor twice -- three times

4   if you include the figures.  And a visual editor is described

5   as doing only one thing in this patent, and that is cutting

6   the source material into discrete pieces.

7        If you look at column 7, lines 3 through 12, it says, "the

8   word cutting process is accomplished using a simple visual

9   editor.  For example, a point-and-click system using a

10  pointing device such as a mouse."  That is the only function

11  that is associated with a visual editor.

12       A visual editor is not described as compiling the discrete

13  cut pieces into an image.  It has nothing to do with creating

14  the image.  There is no structure described in the patent as

15  doing this.  It is only described as something that has been

16  done.  Now, that's fine outside of a means-plus-function

17  context.  But in the means-plus-function context, there must

18  be structure in the specification.

19       And with computer-implemented functionality, it needs to

20  be an algorithm except in a few minor exception places from

21  the *Katz* case.  But here, you know, this is not one of those

22  exceptions.  Compilation is something that needs to be

23  described with -- it could be a rudimentary algorithm, but

24  there's nothing here.

25       And what Sentius points to, the visual editor or the user

```
 1    interface, those things are not associated.  They're not

 2    clearly linked with the functionality.  And for that reason,

 3    we have no structure and -- this -- this term is indefinite.

 4            THE COURT:  Mr. Seth?

 5            MR. YORIO:  Your Honor, this is Mr. Yorio.  I have

 6    this term for Sentius.

 7            THE COURT:  Okay.  Mr. Yorio.

 8            MR. YORIO:  Could we put up Slide 61 from Sentius.

 9            MR. SETH:  I'll put that up.

10                (Demonstrative published.)

11            MR. SETH:  Sorry.

12            MR. YORIO:  61.

13            MR. SETH:  Sorry.

14                (Demonstrative published.)

15            MR. YORIO:  In response to what Mr. Marton mentioned,

16    there is more than sufficient corresponding structure in the

17    patent specification with respect to visual editors and

18    user -- graphical user interfaces.

19       Dr. Madisetti addressed that in his declaration and in his

20    deposition.  And visual editors at the time map the

21    character's position in a document to a corresponding screen

22    position so the visual editor can display on the screen the

23    image of the characters.

24       And they work together to -- with the graphic uner-

25    [phonetic] -- user interface to generate an image of the text,
```

1    and that is the compiling the source material image structure.

2          And I would point out that the Madisetti testimony on

3    these issues, not disputed by Dr. Weissman on the Zoho side.

4          And with respect to the legal requirements, *Enfish* and

5    *AllVoice* are the federal circuit cases that address what

6    constitutes corresponding structure.  You do not have to

7    require detailed algorithm support.  That's Al- -- *AllVoice*.

8          And with respect to *Enfish*, you can refer to techniques or

9    systems or products that were known to the -- one of ordinary

10   skill in the art at the time to support the corresponding

11   structure.

12         And that is --

13             **THE COURT:**  So --

14         **MR. YORIO:**  -- exactly what *Enfish* says.  And

15   Dr. Madisetti's testimony is in line with both *Enfish* and

16   *AllVoice*.

17             **THE COURT:**  With respect to the patent itself,

18   Mr. Yorio, can you tell me what portions of the patent

19   specifically you rely on as the best case for linking the

20   conversion function to the visual editors and electronic

21   viewer modules.

22             **MR. YORIO:**  The conversion function or the compiling

23   function, Your Honor?

24             **THE COURT:**  Well, do them both.  What is the best --

25   the best evidence for you in terms of a patent?

1          **MR. YORIO:**  Compilation?  Let me deal with -- address

2     that first.  It's on column 7 beginning with line 22.  And it

3     takes you all the way through to 49.  And it takes --

4          **THE COURT:**  Okay.

5          **MR. YORIO:**  -- you through the compilation process at

6     that point.

7          And the visual editor, if -- if I may, Slide 59.

8                    (Demonstrative published.)

9          **MR. YORIO:**  Slide 59, Your Honor, identifies two

10    known visual editors at the time of the patent application,

11    the Emacs version 18.59 --

12         **THE COURT:**  Okay.  I don't want your PowerPoint.  I

13    just want your -- the reference in the patent itself.  To the

14    extent that it's there, your best evidence what of what's in

15    the patent to support your position.

16         **MR. YORIO:**  And all the references to visual editors

17    in the patent would mean to one of ordinary skill in the art,

18    visual editors like the two that are described in Slide 59.

19         It's not just --

20                    (Simultaneous colloquy.)

21         **MR. YORIO:**  -- general term or --

22         **THE COURT:**  You -- you're just saying the generic

23    reference to visual editor in the patent is your answer.

24         **MR. YORIO:**  No, that's the -- that's start of the

25    answer.  But "visual editor," if you are in looking at column

 1    5, beginning at line 15, talks how a wordified link text

 2    database is constructed to build a wordified database, the

 3    visual editor 19 does that.  And we're talking about

 4    Figure 1., which in context to that, the visual editor

 5    performs the functions that you see from line 15 to line 25.

 6              THE COURT:  Column 5?  I just want the --

 7                   (Simultaneous colloquy.)

 8              MR. YORIO:  Column 5, line 15 to 25, Your Honor.

 9              THE COURT:  All right.  I want the references 'cause

10    I'm going to go back and look at the patent myself, so that's

11    all I was asking for.

12              MR. YORIO:  That's okay.

13              THE COURT:  All right.

14         Any response, Mr. Marton?

15              MR. MARTON:  Yes, briefly.  Mr. Seth, if I could take

16    the screen.

17              MR. SETH:  You bet.

18                   (Demonstrative published.)

19              MR. MARTON:  So first, the -- there is -- there's

20    been this assertion that Zoho doesn't dispute that visual

21    editors normally perform these functions.  That's just not

22    even an issue that we've discussed or is relevant to -- to

23    whether or not there's structure here.

24         What we do is we look at the specification.  We look for

25    structure that is linked to the particular functionality.  And

 1    I think Mr. Yorio's argument just highlighted that there is no

 2    link to the functionality.  With regard to the compilation

 3    step, he pointed to column 7, lines 22 through 49.

 4        In that section, it talks about a compilation, but it does

 5    not make any reference to -- to a visual editor.  No part of

 6    this patent says that a visual editor is involved in

 7    compilation.  Visual editors, as I said before, the only thing

 8    it does is cut the source material into pieces.

 9        At -- the same is true --

10                    (Demonstrative published.)

11        **MR. MARTON:**  -- for the converting step.

12        But so I'm done with the compilation step.  If we want to

13    move on to the converting step, I can make a couple of brief

14    arguments, but it's pretty much the same.

15        **THE COURT:**  Yeah.  No, that's what I was going to

16    say.  They seem to be -- again, these two terms seem to be

17    related, so why don't you finish up your comments there, and

18    then we can take our break.

19        **MR. MARTON:**  Sure.  So --

20                    (Demonstrative published.)

21        **MR. MARTON:**  -- with the "means for converting the

22    display address of the selected discrete portion to an offset

23    value from a beginning position address," there is absolutely

24    nothing in the specification explaining structure for this.

25                    (Demonstrative published.)

1           **MR. MARTON:**  All we have, if we look at column 6,

2      lines 48 through 61, is the simple statement that "the click

3      position is determined and used to calculate an offset value

4      within the text," so we know that a click position is

5      determined and that's used to calculate an offset value.  But

6      we don't know how that calculation is done.  There is nothing

7      in the specification explaining what the structure is that

8      does it.

9           Sentius's position is, well, everybody knew how to do

10     this, so there was no need for a disclosure in -- in the

11     specification.  But that just is fundamentally inconsistent

12     with federal circuit law.

13          We have case after case that says having failed to provide

14     any disclosure of structural [sic] for the function, A

15     patentee cannot rely on the knowledge of one skilled in the

16     art to fill in the gaps.  That's from *Function Media v.*

17     *Google*, which is at 708 F.3d 310.

18          We have the *Blackboard v. Desire to Learn* case, which is

19     at 574 F.3d 1371, that says, "A patentee cannot avoid

20     providing sufficient specificity" -- "sufficient specificity

21     as to the structure simply because someone of ordinary skill

22     in the art would be able to devise a means to perform the

23     claimed function.  To allow that" -- "to allow that form of

24     claiming under 112 ¶6 would allow the patentee to claim all

25     possible means of achieving a function."

 1          The whole point with means-plus-function claims is that

 2     the patentee is limited to the structures disclosed in the

 3     specification.  And what Sentius is doing here is trying to

 4     circumvent that requirement and to say, well, anybody would

 5     know how to do it, so any way that someone would know how to

 6     do it, that's the -- that's the structure.

 7          Well, that's not how this works, and these claims are

 8     indefinite.

 9               **THE COURT:**  All right.  Mr. Yorio, a quick response

10     given that these two terms are related at least --

11               **MR. YORIO:**  Yes, Your Honor.

12               **THE COURT:**  -- structure.

13               **MR. YORIO:**  Thank you.

14          The cases that Mr. Marton just cited have all been

15     discussed and distinguished in pages 14 to 15 of our response

16     brief.

17               **THE COURT:**  Okay.

18               **MR. YORIO:**  And it is incorrect to say that the only

19     structure either for compiling or converting is just the

20     visual editor.  That's a misstatement of the -- what we have

21     listed as the structure.

22          For compiling, it's a computer having a visual editor and

23     a user interface program to perform the recited functions.

24                    (Demonstrative published.)

25               **MR. YORIO:**  And for converting, it's a computer with

 1  a visual editor and an electronic viewer module program, so

 2  it's not just the visual editor alone.  It is the way the

 3  visual editor and the user interface or the viewer work

 4  together.

 5      And if you could show Slide 63?

 6          **MR. SETH:**  Is it up?

 7          **THE COURT:**  No, it's not.

 8          **MR. SETH:**  Oh.

 9                  (Demonstrative published.)

10          **MR. YORIO:**  Slide --

11          **MR. SETH:**  Now?

12          **THE COURT:**  Yes, it is now.

13          **MR. SETH:**  Slide 63, Your Honor, on compiling, Dr. --

14  this is summary of Dr. Madisetti's deposition testimony on the

15  subject of what structure is available and what visual editors

16  meant and could do at the time of the patent application.

17      And he goes through in considerable detail that the

18  capacity of the visual editor includes viewing, editing a

19  document, moving a cursor, selected copying and pasting a

20  world [sic] -- a word and that compiling a source material

21  image is a conventional functionality of the visual editor,

22  which is includes a viewer.  You look at them together, they

23  provide adequate constructure to one of ordinary skill in the

24  art under *Enfish* and All Source [sic].  And Dr. Madisetti's

25  testimony is not rebutted on the Zoho side.

```
 1          As for converting on the same slide, converting the
 2     display address to an offset value, also a standard
 3     conventional routine function of a visual editor.  And he goes
 4     on to explain how visual editors --
 5          THE COURT:  Can I ask, when you deposed
 6     Dr. Weissman -- I'm assuming you did depose him, right?
 7          MR. YORIO:  Was not deposed, but he did not submit
 8     a -- a declaration that rebutted this testimony.
 9          THE COURT:  Okay.
10          MR. YORIO:  The next slide, 64?
11               (Demonstrative published.)
12          MR. YORIO:  And this is Dr. Madisetti's testimony
13     about visual editors working in conjunction with graphical
14     user interfaces.  So unlike what Mr. Marton was mentioning,
15     just a visual editor standing alone, it's how the editor works
16     with the user interfaces to compile the source material image.
17          And the cite there to his deposition is -- it's Document
18     57-2, Your Honor, at pages 44 to 56.  That's where the
19     deposition testimony is there.
20          THE COURT:  Okay.
21          MR. YORIO:  One comment for converting, on page --
22     Slide 69.
23               (Demonstrative published.)
24          MR. YORIO:  This is on the "means for converting"
25     term, Your Honor.  And paragraphs -- we've highlighted
```

1    paragraphs -- or excuse me -- excerpts from the patent

2    specifically talking about Figure 2 and the compile process.

3    And the corresponding paragraphs are -- on the right-hand side

4    are from the Madisetti declaration at Docket 51.

5         And in paragraphs 82 and 86, he describes exactly how the

6    conversion of the display address occurs with respect to both

7    the visual editor and its functionality at the time and the

8    user interface, which uses -- used by the editor so that the

9    user input -- input can be provided to indicate a location.

10             **THE COURT:**  All right.  It is -- you should set your

11   clock.  It is now 10:53.  We'll stand in recess until 11:10.

12             **MR. YORIO:**  Thank you, Your Honor.

13             **THE COURT:**  And if -- if you'll take -- Mr. Seth, if

14   you'll take that down, please.  Thank you.

15        (Recess taken at 10:55 A.M.; proceedings resumed at 11:10

16   A.M.)

17             **THE COURT:**  Record will reflect that we're back in

18   session.  And it appears all the parties are here.

19        Taking a look at my notes -- and there was probably one

20   other topic that merited a little bit of argument.

21        Just a moment.

22                     (Pause in the proceedings.)

23             **THE COURT:**  Trying to get all this technology to

24   work.  Just a minute.

25        Okay.  So the May 1996 prosecution history remarks

1    discuss -- discuss "unique tagless linking of the invention."

2    So if -- I guess I should have -- I should have printed this

3    up when I was in chambers.  I want to make sure I get the

4    question right.

5        Okay.  Is that a different argument from the "pure bytes

6    offset" or not?  Or how does it play into the analysis?

7            **MR. MARTON:**  This is Ryan Marton.  If I may address,

8    it -- it is not a different argument than the byte offset

9    argument.

10       So the notion in Cassorla was that it's -- relied on the

11   file itself, information in the document itself such as tags

12   like the -- the heading information, chapter information, for

13   locating a relative position within the document.

14       And what Sentius was saying was, well, we don't rely on

15   information within the document itself, tags or anything else.

16   We rely on memory location which is independent of document

17   format, so we're dealing with an address in a database and

18   then byte offsets from that address in the database.  And so

19   it doesn't depend on any information in the file itself, so

20   not the characters, not the data in the file itself, but

21   memory.

22       So an address in a database and byte offsets from that, so

23   it's -- it's the same argument.

24           **THE COURT:**  Mr. Seth.

25           **MR. SETH:**  Your Honor, it's -- yes, I -- I generally

1    agree it's -- those are related.  And the -- but the -- the

2    distinguishing feature, of course, is that we're counting from

3    the beginning of the -- of the text, again, one byte, two byte

4    [sic], three bytes, but counting characters from the beginning

5    of the have text to -- to the end.

6        And -- and in this regard, I just wanted to -- I failed to

7    mention one cite that I think it's important.  It's Docket

8    52-9, and it's the *Flyswat* claim construction order that's

9    heavily relied on by Zoho.  And at page 36 of the order, Judge

10   Armstrong construed "pure byte offsets" and does not actually

11   construe it as "distance in bytes," as Zoho is -- is

12   proposing.

13       It -- her -- the definition that she adopted -- Judge

14   Armstrong adopted was "the distance from the starting point of

15   data structure stored in electronic storage medium."

16       And I think this just goes back to the difference between

17   Cassorla and the '633 patent.  We're measuring characters from

18   the beginning, and we don't need some guidepost of -- of --

19   you know, of paragraph numbers and headings and that sort

20   of -- that sort of guidepost that's --

21           **THE COURT:**  So can you have an address without a pure

22   byte offset?

23           **MR. SETH:**  Well --

24           **THE COURT:**  Or can you use an address without knowing

25   a pure byte offset?

1          **MR. SETH:**  Well, you can use addresses, which are the

2     character positions to measure the offset, which is how many

3     characters over that you are.

4          I don't know if that's answering your question, though.

5          **THE COURT:**  Mr. Marton?

6          **MR. MARTON:**  No.  In the context of -- of the '633,

7     when -- when you have an address in memory and then you want

8     to identify another address in memory as a distance from that

9     beginning position address, you're going to use byte offsets.

10         But I mean, you obviously can have an address in memory

11    without a byte offset.  And you can have an offset -- well, I

12    wouldn't even confuse things.  I'm not going -- I'll leave it

13    there.

14         **THE COURT:**  Okay.  Let's just move on.

15         **MR. MARTON:**  Your Honor -- oh, I'm sorry.

16         **THE COURT:**  I want to move to the '985 patent.  I

17    believe here for Zoho, we're going to be hearing from Mr. --

18    from Mr. Haack.

19         The first disputed term, it's a series of terms with

20    overlap.  "Data objects" with the term "database" -- "data

21    objects associated with the term database," and "data objects

22    associated with a database."

23         Again, it looks like the first part of your constructions

24    are identical.  Zoho seems to want to add to an agreed

25    starting point the phrase -- well, let me say, you -- you

 1    agree with the following "computer readable data structures
 2    that include data from a or the term database."  That's where
 3    the agreement stops.
 4        Zoho wants to then include "and rules for processing the
 5    one or more documents in linking content with identified
 6    terms."
 7        We'll start with Zoho on this one.
 8            **MR. HAACK:**  Thank you, Your Honor.  If I could share
 9    my screen.
10                    (Demonstrative published.)
11            **MR. HAACK:**  Okay.  Confirm that's up.  Great.
12        So for discussing these "data objects" terms, I think it's
13    helpful to take a look at what role did these objects play in
14    the invention.  And for that, I'm going to look briefly back
15    to my Slide 72.
16                    (Demonstrative published.)
17            **MR. HAACK:**  So as we've heard in a few different
18    environments now, the '985 invention is a little different
19    from the '633 in that it is focused primarily on this concept
20    of syndicating data in the form of data objects from a central
21    database out to a remote site which the patent describes is
22    likely to be a customer or content publisher.  And that
23    content publisher will install some additional software.  It
24    will use those database objects to parse through the pages on
25    their website and add notations and links.

1     And the summary of the invention tells us -- that you see

2   here on Slide 72 -- the -- the RichLink processor, that being

3   the module that people are expected to install, downloads from

4   the network the data structures necessary to perform

5   high-speed tagging of the text and to execute the tagging

6   rules.  And that it then therefore performs routine

7   synchronization of those data structures, so that changes to

8   content within the database, tagging rules, or presentation

9   rules are reflected locally.

10     So when the system described in the patent operates, it's

11   fairly easy to -- to see what it's doing.  Right?  We have a

12   collection of information in a database, want to get it out to

13   a -- to a remote site.  At that remote site, we need to have

14   the ability to do a couple things, which is to see what terms

15   are on the page.  That's the Parsons step, which we'll talk

16   about in a little bit.

17     We need to see if we have content that will map to the

18   significant terms that come out of that parsing process.  And

19   we need to apply linking and processing rules to know where

20   these links should go and how they should work.  And that's

21   how the invention works in a -- in a very high-level view.

22     And we see consistently throughout the specification the

23   data objects are described in sort of two buckets.  In the

24   abstract and in the summary of the invention, they are

25   described either as data objects or data structures at a high

1    level and described as performing the tasks or including the

2    data I just went through.

3        You can see here, on Slide 74, where it says the RichLink

4    processor interacts with the template objects to identify the

5    rules that should be in process -- used in processing, and the

6    Lexicon objects are going to identify what terms should be

7    used in source text.  Those two object types, templates and

8    lexicon objects, those are the only two described in the

9    patent.

10       So if we look at these particular items, we see for

11   instance here in the abstract, the bottom data objects that

12   represent the contents of the database and templates are

13   syndicated to the remote servers and that they -- that it uses

14   these to execute linking rules without requiring a connection

15   to the database.

16       Now, all Zoho's construction is intended to capture is

17   that the computer readable data structures, i.e., data

18   objects, have to include the data that the invention tells us

19   it needs to function because those are the things that get

20   syndicated.  That's these two sets of things.

21       Sentius's construction in comparison is just saying any

22   set of data from the database will do.  So I -- theirs is any

23   subset works.  Our construction says, the patent tells us in

24   great detail we need to do multiple things, which include --

25   and we need to have rules for those things and we need to have

1      the content that will go into those things.  Our construction

2      says, yes, that's what's in the data objects.

3          And --

4                          (Demonstrative published.)

5              MR. HAACK:  -- you'll see in Figure 7 here at

6      Slide 78 that those are the two data types that you see coming

7      in from the RichLink term database --

8              THE COURT:  Let me interrupt you, Mr. Haack.

9              MR. HAACK:  Sure.

10         Why aren't -- I mean, it appears to me that you're

11     importing a limitation.  Why are you not importing a

12     limitation?

13             MR. HAACK:  I think that we're not importing a

14     limitation.  We're just following the description of how the

15     overall system works, so to -- if we -- if I could kind of

16     answer that with a negative example.  If, let's say, the data

17     objects don't have to include any kind of rules.  We're in

18     conflict with both the sort of detailed embodiments described

19     in the patent, as well as the higher-level generic discussions

20     of the invention as a whole, both of which say both data and

21     rules are the things that get syndicated from the central

22     point out to the remote point.

23         So it's not that we're importing the limitation.  It's

24     that we're just following the limitation of how this invention

25     performs its tasks.  You need to know what you're going to

1    link and how.

2           **THE COURT:**  Who's doing this one from Sentius's

3    perspective?

4           **MR. YORIO:**  Mr. Yorio, Your Honor.

5       There are two main objections that we have with the Zoho

6    construction.  One Your Honor just referenced, that they are

7    importing a embodiment in the specification into a limitation

8    of the term.

9       And there's also the -- they're trying to graft an

10   additional requirement that is inconsistent with the claim

11   language.  Slide 73.

12          **MR. HAACK:**  Sorry.  Did you want my Slide 73?

13          **MR. YORIO:**  Oh, I'm sorry.  Our Slide 73.

14          **MR. HAACK:**  Here, I'll drop off.

15              (Demonstrative published.)

16          **MR. YORIO:**  Do you see Slide 73, Your Honor?

17      We called out the language in the claim term in Claim 1 of

18   '985 where the "data objects" term appears.  And in the

19   syndicating element, you see how it's referenced.  And there's

20   no connection to rules for processing or linking at all.

21      Similarly, in the wherein clause, "wherein one or more

22   data objects associated with the term 'database' provide a

23   representation," again, no reference or connection to rules.

24      None of the claims in which database -- "data objects"

25   appear is the rule -- word "rule" even mentioned.  So that all

1   that should be required with this term is that data objects

2   include the data or content and -- from where it's recited, is

3   the term "database."

4        74?

5                    (Demonstrative published.)

6        **MR. YORIO:**  Mr. Haack mentioned the RichLink

7   processor.  That is a preferred embodiment in the patent

8   specification, and it does -- here's the description from the

9   patent about the RichLink processor in the summary of the

10  invention.  I think he touched upon it.

11      But as Your Honor noted, this is a preferred embodiment,

12  and it cannot be imported into claim limitations, and that's

13  exactly what Zoho's trying to do here.

14      One other issue, 75, there are two types of data objects

15  in the preferred embodiment.  "Data objects" is -- is a genus

16  word, and lexicon and template objects are two examples.

17  These are the ones that appear in the specification.

18      The parties agree that the specification describes both

19  types and that data objects can be either lexicon objects or

20  template objects.

21      That was raised at the technology tutorial, and that was

22  the agreement of the experts.

23      Next slide.

24                    (Demonstrative published.)

25      **MR. YORIO:**  And it's only the template object that

 1   contains some rules for processing and linking.  And the

 2   template object appears in the '985 patent at the passage that

 3   you see on this slide.  It's column 9, lines 36 to 51.

 4        Next slide.

 5                  (Demonstrative published.)

 6        **MR. YORIO:**  The data object can be either in a

 7   lexicon or template, and only a template in the preferred

 8   embodiment contains rules for processing or linking.  Then the

 9   proper construction of data objects cannot include such rules

10   and the legal principle that Zoho's construction would violate

11   is they'd be excluding the specific embodiment in the lexicon

12   object.

13        There's another -- next slide.

14                  (Demonstrative published.)

15        **MR. YORIO:**  There's another issue that occurred --

16   problem that Zoho's construction is -- and that involves claim

17   differentiation, which they are not honoring.  And I put up

18   Claim 7 and 8.  These are dependent claims, dependent on

19   Claim 1.  One is talking about a data object which is --

20   comprises a template.  And the other is a data object

21   comprising a lexicon object.

22        And as you see in Claim 7, only Claim 7 references a rule

23   for processing.  Claim 8 doesn't have such a reference.

24        Zoho's construction would be reading out claim --

25   dependent Claim 8, and -- and in addition, where a limitation

```
 1    appears in a dependent claim, like it does in Claim 7, the
 2    limitation is presumed not to be present in the independent
 3    claim.
 4        And that's --
 5            THE COURT:  All right.  So I'm going to stop you.
 6    And -- I cutoff Mr. Haack.  You want to respond to this last
 7    point?
 8            MR. HAACK:  Sure, Your Honor.  I think that this --
 9    that the idea that the existence of two different kinds of
10    data objects and their contents is only in a preferred
11    embodiment is -- is just simply belied by the actual text of
12    both the abstract and the summary of the invention.
13            THE COURT:  Can I ask a clarifying questioning?
14            MR. HAACK:  Of course.
15            THE COURT:  Do you believe the independent claims
16    require tagging?
17            MR. HAACK:  That they require tagging.  I think they
18    require linking.  I'd have to look back and see that they
19    think that they require tagging.  I don't believe they recite
20    "tagging" per se.
21        Yeah.
22            THE COURT:  So you believe that the independent
23    claims require linking?
24            MR. HAACK:  Yes.  I think so, Your Honor.
25        For instance, Claim 1 includes the requirement that the
```

 1     data objects are used to link the identified content with the

 2     at least one term in that final "wherein" clause.

 3          **THE COURT:**  Okay.  With respect to the next disputed

 4     term, think we're at "lexicon objects."

 5          **MR. YORIO:**  Think it's "parsing," Your Honor.

 6          **MR. HAACK:**  Although I'm happy to do "lexicon object"

 7     along with the other data objects if you prefer, Your Honor.

 8          **THE COURT:**  Yeah.  Why don't -- why don't we do that.

 9          **MR. HAACK:**  Okay.

10               (Demonstrative published.)

11          **MR. HAACK:**  Okay.  So "lexicon object," there's a few

12     issues here with Sentius's proposed construction, although the

13     parties are not particularly far apart.

14        If you see here (indicating), Sentius describes the

15     lexicon object as a representation of content used to match

16     terms or to create tags to assist in matching terms to

17     content.

18        The first issue here is, you know, the parties have

19     described a "data object" generally as a "computer readable

20     data structure."  We think it only makes sense to incorporate

21     that agreement here to the lexicon object, which is, of

22     course, one of the kinds of data objects that -- computer

23     readable data structure --

24        (Off-the-record discussion in which the court stenographer

25     requests Her Honor to instruct counsel to speak more slowly.)

1          **MR. HAACK:**  I'll pick up where I was.

2      So the parties agree that a data object is a computer

3   readable data structure.  Sentius has dropped that portion of

4   the construction of "data objects" from its construction of

5   "lexicon object."

6          **THE COURT:**  All right.  I'm going to stop -- I'm

7   going to stop you right there.

8          **MR. HAACK:**  Sure.

9          **THE COURT:**  That's not -- that's not a really

10  controversial issue, is it?

11      Who's doing this one?

12         **MR. YORIO:**  Mr. Yorio.  I don't think it's a

13  controversial issue.

14         **THE COURT:**  Okay.

15      Keep going, then, Mr. Haack.

16         **MR. HAACK:**  Thank you, Your Honor.

17      And the parties agree that the lexicon objects includes

18  [sic] some type of data or content used to match terms.  The

19  content -- and that it might include content to create tags.

20      The key distinction here is that Sentius's proposal is to

21  do one or to do the other.  Zoho's proposal says that it is to

22  do one and to do the other.  One is open-ended.  The other one

23  says it must have both.  And that --

24         **THE COURT:**  Is there -- Hold on.

25         **MR. MARTON:**  Um-hmm.

 1          **THE COURT:**  Is there any -- you also used the word

 2    "local," which is a -- is another distinction.

 3       Is there any kind of real need for the use of the word

 4    "local"?  Is that a point of contention between the parties?

 5          **MR. HAACK:**  I don't --

 6                (Simultaneous colloquy.)

 7          **MR. HAACK:**  Go ahead.  Bob.

 8          **MR. YORIO:**  I'm sorry.  If it was to Sentius, I don't

 9    think that whether "local" is in or not in is a material

10    issue.

11          **THE COURT:**  Okay.  Thank you.

12       All right.  So let's talk about the conjunctive versus

13    disjunctive.

14          **MR. HAACK:**  Okay.

15                (Demonstrative published.)

16          **MR. HAACK:**  So, Your Honor, Zoho's construction is

17    following this description in the specification in column 9

18    that walks us through in fairly straightforward detail what a

19    lexicon object is.

20       It starts off, it provides a local representation of the

21    content of the term "database."  It contains data required to

22    match terms and create tags such as a representation of the

23    terms in that database.  And it includes content for which

24    fast access is required such as annotation content.

25       It doesn't say it might have one or more of these.  It

1    says, "this is what a lexicon object is."  And based on that,

2    we see no reason to broaden it beyond the very plain

3    straightforward description in the spec.

4              **THE COURT:**  All right.

5        A response?  And I think -- you know, stick -- let's stick

6    to the crux of the dispute here, which is the conjunctive

7    versus the disjunctive.

8              **MR. YORIO:**  Right.

9        On Slide -- put our slides up on 88?

10                  (Demonstrative published.)

11             **MR. YORIO:**  Your Honor, Sentius does not believe that

12   conjunctive is appropriate.  It includes an unnecessary

13   requirement into lexicon object that's inconsistent with the

14   patent and the specification.

15       The dispute between the parties is in the second paragraph

16   here and that Zoho says you must include additional data as

17   well as the local representation of content.  We disagree.

18       Next slide, 89.

19                  (Demonstrative published.)

20             **MR. YORIO:**  The -- Mr. Haack was talking about the --

21   a paragraph in column 9.  And this paragraph about "lexicon

22   object contains," they capture the first part of the

23   highlighted sentence, as does Sentius, but they ignore the

24   remainder of the sentence.

25       It's the representation of the terms in the database is

1    used for matching.  And that is all that you need to include

2    for a proper construction.

3        Where you go on from that is an embodiment in the

4    specification that should not be limited into the term.  And

5    that's what they're doing.

6        The next slide.

7                    (Demonstrative published.)

8        **MR. YORIO:**  And the other problem that I have with

9    their construction in the second paragraph here is what part

10   of the specification identifies or defines this other data?

11   They just refer to "other data."  And -- and that's in --

12   improper, and it's -- it's indefinite.

13       The first sentence of the section of lexicon objects is

14   what should be included in the construction.

15       And next slide.

16                    (Demonstrative published.)

17       **MR. YORIO:**  There's also an inconsistency on the Zoho

18   side.  They would conflict with the language and claims in 18

19   while our Sentius construction would not.

20       And there -- what they're doing is a -- introducing

21   additional requirement unsupported by the spec.

22       **THE COURT:**  All right.  Check one thing.

23       Could you bring the -- can you bring the patent slide back

24   up, page 89?

25                    (Demonstrative published.)

1          **THE COURT:**  What -- ask this:  The phrase "such as",

2     what, if any, relevance do you place on those words with

3     respect to your arguments in the highlighted portion?

4          **MR. YORIO:**  Is that to Sentius?

5          **THE COURT:**  It's to both of you.

6          **MR. YORIO:**  Okay.

7      The way I read that is it's an example of what the lexicon

8     object contains and, hence, the word "such as," a

9     representation of the terms in the database.  And I think

10    that's in both parties' constructions.

11         And then the other -- the rest of that sentence, "optimize

12    for fast matching by the RichLink processor," et cetera, that

13    is just an embodiment.  And that -- that preferred embodiment

14    should not be imported into the claims.

15         **THE COURT:**  All right.

16         **MR. YORIO:**  -- clearly is an example.

17         **THE COURT:**  Mr. Haack.

18         **MR. HAACK:**  Yeah, Your Honor, as you -- as you may

19    suspect, I take the contrary view, right?

20      I read that sentence as saying very definitively, the

21    lexicon object contains data required to, one, match terms,

22    and, two, create tags.  And that's why our construction says

23    it's content to match terms and create tags.

24      And then the rest of it is the part that is potentially

25    optional, right?  Such as a representation of terms in the

 1  database on which these things have been processed, you know,

 2  optimize for fast matching, and so on.

 3          **THE COURT:**  Okay.  We don't have much time Left.

 4      "Parsing."

 5          **MR. HAACK:**  Do you have a preference on who starts

 6  that, Your Honor?

 7          **THE COURT:**  Well, let's go ahead and start with you

 8  again, Mr. Haack, because, again, you're seeking to achieve a

 9  definition that is much more complex than that of Sentius.

10              (Demonstrative published.)

11          **MR. HAACK:**  Sure, Your Honor.

12      Okay.  So have the parsing slides up, I hope.

13      You'll see here there are two terms here.  The differences

14  are minor in that the phrase in Claim 21 includes "source

15  documents" and "predetermined rules" --

16          **THE COURT:**  So, Mr. Haack, what kind of device are

17  you using to speak?

18          **MR. HAACK:**  I have a headset on.

19          **THE COURT:**  All right.  So I agree with the court

20  reporter, you go in and out.

21          **MR. HAACK:**  Here -- Your Honor, could you give me one

22  second.  I have another device I can plug it into and see if

23  it's any better.  I'll do that right now.

24              (Pause in the proceedings.)

25          **MR. HAACK:**  Is that better?

1          **THE COURT:**  I think so.  Try it.  Let's try it.

2          **MR. HAACK:**  Okay.

3      All right.  I'll continue like this, and let me know if

4      it's a problem.  I apologize for that.

5          **THE COURT:**  That's all right.

6          **MR. HAACK:**  So we are here at the -- the distinction

7      between these two terms is small.  The second phrase from

8      Claim 21 includes just that the rules are predetermined and

9      refers to the documents as source documents.

10      Now, the reason that Zoho's construction includes more

11      sort of features than Sentius's -- Sentius's proposal is

12      because it follows what the spec tells us about the parsing

13      process in the '95 patent.

14      "Parsing" is mentioned in only a couple locations in the

15      patent.  And where it is mentioned, it is described at a very

16      high level.  So, for instance, here, in the summary of the

17      invention, it simply says, "Term identification may be

18      accomplished by crawling and parsing."  They don't tell us

19      what they're doing when they're doing that parsing.

20      In Figure 6, there's a little more information where it

21      says that files matching certain types are parsed using

22      natural language processing to tokenize the text into

23      significant objects such as words and phrases.

24      And the parties agree that that is essentially part of the

25      process.  When they say, segmenting, right?  "Tokenizing"

1    means breaking a natural language input into smaller chunks,

2    into tokens that can be processed, so hence the agreed portion

3    of the construction segmenting.

4        And -- but this sentence goes on.  It does not stop at

5    significant words and phrases.  And it says, "until a full

6    index of all words and phrases on the site is created," and

7    then, "from this full index," moving to Slide 85, "Terms of

8    interest are chosen using a set of rules."

9        And so our construction --

10                   (Demonstrative published.)

11        **MR. HAACK:**  -- is based on the only place in the

12    patent that tells us what the patent means when it says

13    there's a parsing process.  And that is to say, we tokenize

14    it, i.e., segment it into significant objects that is used to

15    create a full index of all words and phrases on the site.  And

16    that index is the -- the set from which terms of interest are

17    selected using a -- a set of rules.  It's really very

18    straightforward.

19        Sentius's construction essentially takes by saying --

20    breaking down one or more documents into segments and to

21    identify a term based on a rule, they take -- whoops, I'm

22    sorry -- back on Slide 84 -- essentially would like to take

23    the first highlighted sentence, the second highlighted

24    sentence, and then skip the next part of that highlighted

25    line, skip the last part of the sentence, and add part of the

```
 1   next sentence.

 2      They just want to delete this line that says, "until a

 3   full index is created."

 4           THE COURT:  Well, Mr. Yorio, are you doing this one

 5   as well?

 6           MR. YORIO:  I am, Your Honor.

 7           THE COURT:  All right.

 8           MR. YORIO:  If you could --

 9           THE COURT:  So --

10           MR. YORIO:  Go ahead, Your Honor.

11           THE COURT:  Mr. Haack, if you'll take that down.

12      I mean, as I look at what is being recommended by Sentius,

13   you really haven't defined too much.  I mean, we've got a

14   disputed term and, really, the only definition that you're

15   suggesting here is to define "parsing one or more

16   documents" --

17                   (Demonstrative published.)

18           THE COURT:  -- to be "breaking one or more documents

19   into segments."  I mean, the rest is just a recitation of the

20   rest of the term.

21           MR. YORIO:  Well, Your Honor, I -- I think the term

22   really -- and I -- I mean, the phrase is one that Zoho

23   proposed.  But from Sentius's point of view, the term is

24   "parsing."  And "parsing" is breaking one or more documents

25   into segments, and both parties agree.  It's a basic
```

1  functionality in any visual editor.

2  What they are trying to do is to take language where

3  "parsing" appears and graft that onto a longer phrase.  And I

4  don't think that's proper because what it -- what they're

5  really trying to do is import a preferred embodiment from the

6  spec into the claim language.

7  Let me show you 81.  Slide 81.

8  (Demonstrative published.)

9  **MR. YORIO:**  So the text at -- and you see in the

10  middle, Your Honor, at column 6, 57, 60, this was the sentence

11  in Mr. Haack's slide that he contended Sentius was ignoring.

12  I don't agree with that.  I think Zoho is misreading it.

13  What that sentence says is that "Files matching the

14  specified types are parsed using natural language processing,"

15  et cetera, "until a full index of words and phrases on the

16  site is created."  So it's a timing mechanism.  It isn't --

17  you don't incorporate a full index into "parsing."

18  So -- as I mention in the next paragraph, what they're

19  trying to take any part of the process in this embodiment and

20  automatically add it to the construction.

21  Next slide.  The word -- the key word in the last sentence

22  on column 6 is "until."  And Mr. -- Dr. Madisetti addressed in

23  at paragraph 96 of his declaration.  That's Docket 51.

24  But in the middle of the -- of the slide here, the parsing

25  continues until such time as the full index of all words and

1   phrases on the site is created.

2        It's talking about continuing until a particular event

3   occurs.  Zoho pays short shrift to the word "until," and they

4   just want you to go to "index."  It's not proper.

5        And 80 -- Slide 83 --

6                     (Demonstrative published.)

7        **MR. YORIO:**  -- describes the claim construction

8   principle that the Zoho construction would violate.

9        They're trying to exclude a preferred embodiment which is

10  rarely ever correct under long-standing claim construction

11  principles.

12       **THE COURT:**  All right.  I think I understand the

13  argument.

14       Okay.  I, unlike some of my colleagues, do not rule from

15  the bench on claim construction unless I have some wonderful

16  idea that I can get the parties to all agree on, in which case

17  we agree on that and we move on.

18       I hope to have something out, you know, in the

19  not-too-far-distant future.  I have a good understanding of

20  what the issues are.

21       Is there anything else you want to say before we close

22  down for the day?

23       From Zoho?  Mr. Marton?

24       **MR. MARTON:**  I have nothing further, Your Honor.

25  Thank you.

1          **THE COURT:**  Okay.  From Sentius?

2          **MR. SETH:**  Nothing further, Your Honor.

3          **THE COURT:**  All right.

4      Okay.  Then everybody have a good weekend.  We're

5  adjourned.  Thank you very much.

6          **MR. SETH:**  Thank you, Your Honor.

7          **MR. HAACK:**  Thank you, Your Honor.

8          (Proceedings were concluded at 11:51 A.M.)

9                        --o0o--

10

11

12              **CERTIFICATE OF REPORTER**

13

14          I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16  I further certify that I am neither counsel for, related to,

17  nor employed by any of the parties to the action in which this

18  hearing was taken, and further that I am not financially nor

19  otherwise interested in the outcome of the action.

20

21  _____

22      Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

23              Tuesday, July 21, 2020

24

25