# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZOHO CORPORATION,<br>    Plaintiff,<br>vs.<br>SENTIUS INTERNATIONAL, LLC,<br>    Defendant.<br><br>SENTIUS INTERNATIONAL, LLC,<br>    Counterclaim-Plaintiff,<br>vs.<br>ZOHO CORPORATION ET AL.,<br>    Counterclaim-Defendants. | CASE NO. 19-cv-00001-YGR<br><br>**ORDER GRANTING ZOHO'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>Re: Dkt. No. 81 |

Plaintiff Zoho Corporation brings this declaratory judgment action against defendant Sentius International, LLC ("Sentius") for judgment that it does not infringe Sentius' patents. Sentius counterclaims against Zoho Corporation and Zoho Corporation Pvt. Ltd. (collectively, "Zoho") for infringement of U.S. Patents Nos. RE43,633 (the "'633 Patent") and 7,672,985 (the "'985 Patent").

Now before the Court is Zoho's motion for partial summary judgment. Zoho argues that the '633 Patent is invalid for lack of written description under 35 U.S.C. § 112. Specifically, Zoho claims that the specification provides no written description for the term "the address at which [a] textual source material starts in an electronic database." Having carefully considered the papers submitted, the arguments of the parties at the hearing, the admissible evidence, and the pleadings in this action, and for the reasons set forth below, the Court **GRANTS** Zoho's motion.

**I.  BACKGROUND**

The '633 Patent is titled "System and Method for Linking Streams of Multimedia Data to Reference Material for Display."  ('633 Patent at Cover Page.)  The '633 Patent is a reissue of U.S. Patent No. 5,822,720 (the "'720 Patent"), which was filed on July 9, 1996.  (*Id*.)  The Court briefly reviews the technology described in the '633 Patent and the claim constructions adopted in this case.

**A.  The '633 Patent**

The '633 Patent is directed to a "novel indexing scheme" for displayed elements.  ('633 Patent at 1:27-31.)  A user attempting to learn a new language may struggle with unfamiliar words or characters in a text.  (*Id*. at 2:46-56.)  To help the user acquire language skills, the '633 Patent aims to provide an interface where a user can select a word to display its definition, pronunciation, and other useful information.  (*Id.* at 4:14-32.)  Figure 3 shows the proposed interface, where the user has selected a Japanese word for translation, below:



(*Id*. at Fig. 3, 7:51-53.)

In order to provide this interface, the '633 Patent must determine which word the user selected and link it to the appropriate reference information.  (*Id*. at 5:20-25.)  The patent refers to this co-location process as "indexing."  (*See id.* at 5:19-25, 6:39-43.)  The indexing process uses three steps:  word cuts, linking, and compilation.  (*Id*. at 7:1-2.)  First, the original source material (such as a text file) is "cut up" or divided into individual words or characters using a visual editor.

1 (*Id*. at 7:3-12, 5:14-20.)  The visual editor uses a simple point-and-click system to delineate words.
2 (*Id*. at 7:4-12.)  Second, an index is created to identify the location of each word and link it to
3 external source material (such as translations).  (*Id*. at 7:13-21.)  Finally, the text and references
4 are recompiled to create the image that the user sees, which allows the user to click on the image
5 to trigger the supplemental material.  (*Id*. at 7:22-29.)

6       A "key feature" of the system lies in the method of indexing the source material to the
7 supplemental content.  (*Id.* at 7:30-32.)  When the image is recompiled, individual words are
8 indexed "based upon the position offset from the beginning of the text."  (*Id*. at 7:32-34.)  The
9 start and end points of the cut text are recorded in a look-up table together with links to external
10 references.  (*Id*. at 7:34-36.)  Then, when the user clicks on the text image, the location of the click
11 is converted into a position offset from the beginning of the text and compared to the start and end
12 values in the look-up table.  (*Id*. at 7:40-49.)  The comparison of the offsets indicates which word
13 was selected and the external reference to be displayed.  (*Id*. at 7:47-49.)

14       For example, in Figure 2, shown below, the user clicks on location with coordinates 100
15 horizontal and 75 vertical, which is converted to an offset value of 25 and compared to the start
16 and end points of each word in the look-up table.  (*Id.* at 6:48-59.)  Based on the range of the word
17 in the third row (20 to 27), the linked text located at position 200 is returned.  (*Id*. at 6:59-64.)



3

1 (*Id*. at Fig. 2, 6:48-50.)

2   Figure 1 provides another view of this indexing system below.  (*Id*. at 5:12-14.)  First, a text file (or an audio/video file with synchronized text) is fed into a visual editor.  (*Id*. at 5:15-20.) The visual editor divides the text to create a "wordified database." (*Id*.)  The database then sources two modules, a grammar parser and a link engine, to build an index.  (*Id*. at 5:19-25.)  The index locates each word in the source material and relates it to an external reference located in a relational database.  (*Id.* at 5:19-25.)  The selected text and reference material are then output as a word list with linked entities to an "indexor/viewer," which uses them to build a file.  (*Id*. at 5:26-34.)  The file consists of a data resource, an offset index, and linked entities.  (*Id*. at 5:30-34.) From this file, the electronic viewer provides an interface with the above-described functionality. (*Id*. at 5:35-39)



(*Id*. at Fig. 1.)

Sentius asserts independent claims 17, 18, 62, 101, and 146 against Zoho.  (Dkt. No. 81-8 ("Infringement Contentions").)  Claim 64 recites:

> 64.  A computer-implemented method for linking textual source material to external reference materials for display, the method comprising the steps of:
>
> > determining a beginning position address of textual source material stored in an electronic database;
> >
> > cutting the textual source material into a plurality of discrete pieces;
> >
> > determining starting point addresses and ending point addresses of the plurality of discrete pieces based upon the beginning position address;
> >
> > recording in a look up table the starting and ending point addresses;
> >
> > linking the plurality of discrete pieces to external reference materials by recording in the look-up table, along with the starting and ending point addresses of the plurality of discrete pieces, links to the external reference materials, the external reference materials comprising any of textual, audio, video, and picture information;
> >
> > selecting a discrete portion of an image of the textual source material;
> >
> > determining a display address of the selected discrete portion;
> >
> > converting the display address of the selected discrete portion to an offset value from the beginning position address;
> >
> > comparing the offset value with the starting and ending point addresses recorded in the look-up table to identify one of the plurality of discrete pieces;
> >
> > selecting one of the external reference materials corresponding to the identified one of the plurality of discrete pieces; and
> >
> > displaying on a computer the selected one of the external reference materials.

**B.     Claim Constructions**

The Court held a claim construction hearing on May 8, 2020, and issued a claim construction order on June 12, 2020.  (*See* Dkt. Nos. 80 ("Claim Construction Tr."), 73 ("Claim Construction Order").)  During claim construction, Sentius argued that the limitations requiring addresses, including the "beginning position address of [a] textual source material," refer to character positions in a text.  (Dkt. No. 49 ("Joint Claim Construction Statement") at 10, 14.)

Thus, Sentius sought to construe "beginning position address of [a] textual source material" as "[f]irst character position of a textual source material." (*Id*. at 10.) Zoho, on the other hand, maintained that the terms must refer to addresses on an electronic database. (*Id.*) Thus, Zoho sought to construe "beginning position address of [a] textual source material" as "the address at which source material starts in an electronic database." (*Id*.)

The Court adopted Zoho's construction. As explained in the claim construction Order, Sentius had expressly changed "beginning position" to "an address on [an] electronic database for the beginning position" during prosecution to emphasize that the '633 Patent is not limited to relative positions in a text. (*See* Claim Construction Order at 12:20-13:14.) Although the reissue proceedings altered the wording of this limitation, the change did not change the meaning of the term. (*Id*. at 5:23-6:7.) Sentius' claim that "address" refers to character positions improperly attempted to reverse this distinction and conflate "electronic database" with the "textual source material." (*Id*. at 13:24-14:11.) The Court rejected the attempt.

As relevant to this Order, the parties had also agreed to construe "database" as "a data structure for accepting, storing and providing, on demand, data for at least one user." (Joint Claim Construction Statement at 5.) The parties further agreed that the steps recited in the method claims must be performed in the recited order. (*Id*.) Finally, the Court construed the term "offset" as "a value from a beginning point," consistent with Sentius' proposed construction. (Order at 16.) Thus, the following table summarizes the claim constructions relevant to this Order:

| Term | Construction |
|---|---|
| "beginning position address of [a] textual source material" | the address at which [a] textual source material starts in an electronic database |
| "database" | a data structure for accepting, storing and providing, on demand, data for at least one user |
| "offset" | value from a beginning point |
| Method claims of the '633 Patent | Steps must be performed in the recited order |

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual disputes are only "genuine" if the evidence could cause a reasonable jury to reach a verdict for the other party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The movant can meet its burden by "showing . . . there is an absence of evidence to support the nonmoving party's case." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (citation and quotation omitted). Once the movant meets its burden of showing the absence of genuine issues of material fact that burden shifts to the nonmoving party, who must demonstrate the existence of a material issue of fact. *Mahdavi v. C.I.A.*, 898 F.2d 156 (9th Cir. 1990) (citations omitted).

A party opposing summary judgment must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Turner v. Brown*, 961 F.2d 217 (9th Cir. 1992) (citations omitted). The opposition party "cannot rest on the allegations in his pleadings to overcome a motion for summary judgment." *Id.* Defendants "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Inudus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III. ANALYSIS

Zoho contends that the '633 Patent is invalid under 35 U.S.C. § 112 because the specification provides no written description for the term "determining a beginning position address of a textual source material stored in an electronic database," which is present in all asserted claims. The Court reviews the legal requirement for written description and then considers the specification and submitted evidence.

### A. Written Description

Section 112, paragraph 1, of the Patent Act, states as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated

7

by the inventor of carrying out his invention.

35 U.S.C. § 112 ¶ 1 (pre-AIA); *see also* 35 U.S.C. § 112(a) (post-AIA).  This paragraph imposes three requirements: (1) written description, (2) enablement, and (3) best mode.  *U. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 921 (Fed. Cir. 2004).  Although the requirements are interrelated, they each provide an independent basis for invalidity.  *See id.*

Written description requires the specification to "clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed." *Ariad Pharmas., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  Put differently, the disclosure in the patent must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id*.  The purpose is two-fold:  first, it "serves a teaching function, as a 'quid pro quo' in which the public is given 'meaningful disclosure in exchange for being excluded from practicing the invention for a limited period of time," and second, it "ensure[s] that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *U. of Rochester*, 358 F.3d at 920, 922 (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 970 (Fed. Cir. 2002) and *Reffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000)).

As the Federal Circuit recognized, the term "possession" "has never been very enlightening." *Ariad*, 598 F.3d at 1351.  Nevertheless, it implies a documentary function:  the inventor must not only know how to practice the invention, but must *prove* that understanding through the disclosure in the specification. *Id*.  Otherwise, if written description was not required, a patentee could claim a "mere wish or plan" without having fully invented anything, and thus improperly exclude others from the field.  *See Regents of the U. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997); *Ariad*, 598 F.3d at 1352-53 ("[R]equiring a written description of the invention plays a vital role in curtailing claims . . . that have not been invented, and thus cannot be described."); *O'Reilley v. Morse*, 56 U.S. 62, 120-21 (1853) (explaining the "evil" of lack of written description as "prevent[ing] others from attempting to improve upon the manner and process which [the patent owner] has described in the specification").  Thus, evidence of

actual "possession" of the invention is not enough; "the specification itself [] must demonstrate possession." *Ariad*, 598 F.3d at 1352.

The precise form of the disclosure may vary. "It is not necessary that the exact terms of a claim be used *in haec verba* [in these words] in the specification." *Nalpropion Pharmas., Inc. v. Actavis Labs. FL, Inc.*, 934 F.3d 1344, 1350 (Fed. Cir. 2019). Instead, "equivalent language may be sufficient." *Id.* For example, in *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1346 (Fed. Cir. 2016), the court found sufficient written description, even though the specification did not use the specific words used in the claims, because the words it did use "would express the same concept" if placed in the claims. In other words, the scenario was "simply a case where the patentee used different words to express similar concepts." *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1120 (Fed. Cir. 2004)); *see also Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed Cir. 2015) (reversing summary judgment where the claims used "disparate databases" and the specification described "incompatible databases").

Moreover, the required level of detail may vary. *Ariad*, 598 F.3d at 1351. Novel elements require more description, while well-known elements require less description. *See id.* at 1351-52. Thus, "in the nineteenth century, use of the word 'automobile' would not have sufficed to describe a newly invented automobile; an inventor would need to describe what an automobile is, *viz.*, a chassis, an engine, seats, wheels on axles, etc." *U. of Rochester*, 358 F.3d at 923. However, use of the word "receiver" may suffice to describe a claimed receiver, where such components were well-known at the time of the filing of the patent. *EnOcean GmbH v. Face Int'l Corp.*, 742 F.3d 955, 961 (Fed. Cir. 2014). Inventions in predictable fields may also require less disclosure than inventions in unpredictable fields. *Ariad*, 598 F.3d at 1351. It is therefore "unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005).

The requirements may also change depending on the importance to the invention. "[T]he novel aspects of the invention must be disclosed and not left to inference, that is, a patentee may

not rely on inference of a person of ordinary skill in the pertinent art to supply such novel aspects." *Crown Ops. Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1380 (Fed. Cir. 2002). For example, in *Nuvo Pharmaceuticals (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1375 (Fed. Cir. 2019), the patent owner argued that the invention was non-obvious because "ordinarily skilled artisans would not have expected it to work" to achieve the claimed effectiveness. However, the specification never stated that the invention was effective and had "nothing more than the mere claim that [the compound] might work." *Id*. at 1380-81. Thus, the specification did not show that the inventor "possessed and actually invented what he claimed," and the patent claims were invalid. *Id*. at 1384.

Furthermore, the scope of the written description must be commensurate with the scope of the claims. *Cisco Sys., Inc. v. Cirrex Sys., LLC*, 856 F.3d 997, 1007-08 (Fed. Cir. 2017). "[A] broad claim is invalid when the entirety of the specification clearly indicated that the invention is of a much narrower scope." *Id*. (quoting *Carnegie Mellon U. v. Hoffman-La Roche Inc.*, 541 F.3d 1115, 1127 (Fed. Cir. 2008)). For example, in *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1474-75 (Fed. Cir. 1998), the patentee claimed a sectional sofa with two reclining seats and a console. The claims broadly recited that the recliner controls could be located anywhere, but evidence showed that the patent owner never considered placing them anywhere other than the console. *Id*. at 1478-79. The court found the claims invalid for lack of written description because the "disclosure unambiguously limited the location of the controls to the console," and the patent owner was "not entitled to claims that were broader." *Id*. at 1480.

Under a narrow set of circumstances, the specification may "inherently" disclose certain limitations." *Nuvo Pharmas.*, 923 F.3d at 1382-83. "Under the doctrine of inherent disclosure, when a specification describes an invention that has certain undisclosed but inherent properties, that specification serves as adequate written description." *Yeda Res. & Dev. Co. v. Abbott GmbH & Co. KG*, 837 F.3d 1341, 1345 (Fed. Cir. 2016). "Inherent" properties are those that are "necessarily present" in the invention. *See Schering Corp. v. Geneva Pharmas.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). For example, in *Yeda*, 837 F.3d at 1345, the claims required a particular protein, and the specification described amino acid sequences and traits that could only describe

10

that protein. Similarly, in *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1309 (Fed. Cir. 2015), the claims recited compounds that had a particular clinical efficacy and the specification described chemicals that, if implemented, would necessarily have that efficacy.

Thus, "[w]ritten description analyses are highly fact specific" and vary depending on the context and background state of the art. *Nuvo Pharmas.*, 923 F.3d at 1383; *see also Ariad*, 598 F.3d at 1351. What matters is that "'the essence of the original disclosure' conveys the necessary information—regardless of *how* it' conveys such information and regardless of whether the disclosure's 'words [a]re open to different interpretation[s].'" *Imphi Corp. v. Netlist, Inc.*, 805 F.3d 1350, 1354 (Fed. Cir. 2015) (emphasis in original) (quoting *In re Wright*, 866 F.2d 422, 424-25 (Fed. Cir. 1989)). Nevertheless, "[w]hat is claimed by the patent application must be the same as what is disclosed in the specification." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002). "[O]ne skilled in the art, reading the original disclosure, must immediately discern the limitation at issue." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000). Merely rendering the limitation obvious or enabled is not enough. *Ariad*, 598 F.3d at 1352; *see also Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) ("[A]ll the limitations must appear in the specification.").

Determining whether the patent satisfies written description is a question of fact. *Ariad*, 598 F.3d at 1351. "Patents are presumed to be valid and overcoming this presumption requires clear and convincing evidence." *Centecor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1347 (Fed. Cir. 2011). Nevertheless, summary judgment of lack of written description may be granted "based solely on the language of the patent specification" since "[a]fter all, it is in the patent specification where the written description requirement must be met." *U. of Rochester*, 358 F.3d at 927. Thus, the test for written description "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad*, 598 F.3d at 1351. Expert testimony does not defeat summary judgment where the specification is otherwise insufficient. *See id.* at 1357-58 & n. 8.

//

**B.     Analysis**

Zoho challenges the written description for the term "determining a beginning position address of a textual source material stored in an electronic database." Under the Court's claim construction, this limitation requires determining "the address at which a textual source material starts in an electronic database." Under the parties' construction, "database" is a "data structure for accepting, storing and providing, on demand, data for at least one user."

The Court considers the issues in turn: first, where does the specification describe a textual source material stored in an electronic database, and second, where does the specification describe determining the address at which that textual source material starts in the database.[1]

*1.     "textual source material in an electronic database"*

The specification describes a textual source material in two instances. First, in relation to Figure 1, the specification states:

> An electronic book and/or a multi-media source material is provided as a teaching resource. A text file 10 and/or a multimedia source 14 . . . is edited during construction of a linked text database by a visual editor 19 that is used to build a wordified database 20. The database 20 sources a grammar parser 23 and a link engine 22 that builds an index 21 which, in turn, locates each textual and audio-video reference in the source material.

('633 Patent at 5:14-23; *accord* '720 Patent at 5:3-12.)

Second, in relation to Figure 2, the specification states:

> The original text is provided by a publisher in electronic form in a raw binary text format (e.g. an ASCII text file or other word processor file). The text is the divided up into the component word or phrases in preparation for the next step . . . . The database 20 sources a grammar parser 23 and a link engine 22 that builds an index 21 which, in turn, locates each textual and audio/video reference in the source material.

('633 Patent at 7:8-18; *accord* '720 Patent at 7:2-12.)

Based on these two disclosures, and relying on the declaration of Dr. Vijay Madisetti,

---

[1] Because the '633 Patent is a reissue, "the original specification must satisfy the written description requirement." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1366 (Fed. Cir. 2009). Here, the specification of the '720 Patent is substantively identical to that of the '633 Patent. (*See* Dkt. No. 81-6 ("'720 Patent").) The Court cross-references both specifications for convenience.

12

1    Sentius argues that either the electronic document opened by the visual editor or the "wordified
2    database" created by the visual editor represent the "textual source material in an electronic
3    database." (*See* Dkt. No. 84-2 ("Madisetti Decl.") ¶ 49.)

4    Sentius fails to persuade. First, the textual source material cannot itself be the electronic
5    database. As explained in the claim construction order, Sentius had expressly added the limitation
6    requiring an "electronic database" to distinguish prior art that used relative position in a text for its
7    offset indexing scheme. (*See* Claim Construction Order at 4:6-5:15.) If textual material was
8    conflated with the electronic database, the distinction would collapse. (*Id*. at 13:24-14:11.)
9    Sentius' current argument that the electronic document becomes a "database" when opened is
10   neither supported by the specification—which refers broadly to "editing" and "providing" the
11   document without "opening" it—nor is it meaningful for distinguishing offset indexing systems
12   that use relative positions in a text.

13   Moreover, as shown in Figure 1, the textual source material is not itself a database—it is
14   an input into the visual editor to create the database. ('720 Patent at Fig. 1.) Zoho's expert, Dr.
15   Weissman confirms that "the text file is an input to a process that creates a database; it is not the
16   database itself." (Dkt. No. 81-3 ("Weissman Decl.") ¶ 29 .) Sentius fails to explain how the
17   electronic document satisfies the construction of the term "database," particularly where the
18   specification uses the word "database" but not to refer to the electronic document.[2]

19   Second, the "wordified database" cannot be the electronic database because the parties
20   agree that the method claims must be performed in order. Here, the order requires "determining a
21   beginning position address of a textual source material stored in an electronic database" *before*
22   cutting the textual source material into a plurality of discrete pieces." ('633 Patent at claims 62,

---

[2] Although neither party raises the issue, the Court doubts whether the text file would meet the parties' agreed-to construction for "database." The parties agreed to construe "database" as a "data structure for accepting, storing and providing, on demand, data *for at least one user*." (Joint Claim Construction Statement at 5 (emphasis added).) But as Sentius explained at the hearing for this motion, the compilation step that creates the image that the user sees is not performed until steps 21 through 29 in Figure 1, by the "viewor indexor," which operates on "a word list 28 derived from the input text file 10"—not the text file itself. (*See* '633 Patent at 5:26-34, 7:23-49.) Without deciding that the parties' construction is correct, the Court questions whether the textual source material provides any information to a user prior to indexing and compilation.

13

1   146.) But the visual editor creates the wordified database, by dividing the text "into components
2   of text" using a point and click system. (*Id.* at 5:14-19, 7:4-12; *accord* '720 Patent at 5:4-9, 6:64-
3   7:6.) Accordingly, the wordified database cannot satisfy the limitation for the method claims
4   because it is created after (and through) the word cut process.

5   Sentius argues that Zoho cannot establish invalidity because the experts disagree over
6   whether the specification demonstrates possession of this term. However, and notably, Dr.
7   Madisetti does not opine that Sentius was in possession of a "textual source material stored in an
8   electronic database." Instead, Dr. Madisetti opines that "the specification shows that the skilled
9   artisan that inventors had possession of the claimed invention which (a) took an electronic
10  document" and "(b) created an electronic database by opening the electronic document in a visual
11  editor for parsing." (Madisetti Decl. ¶ 5; *see also id.* ¶ 43 ("[An] electronic document opened by
12  the visual editor is considered a database."), ¶ 49 ("[T]he inventors possessed "a beginning
13  position address in an electronic database.").) That is not what the claims require. The claims
14  require textual source material *stored in* the electronic database—not textual source material that
15  *becomes* the electronic database.

16  Nor does the declaration of the inventor, Marc Bookman, establish otherwise. (Dkt. No.
17  84-1 ("Bookman Decl.").) Mr. Bookman opines that he invented a system to "cut (parse) an
18  electronic document opened by a visual editor into discrete pieces (words) and to link any given
19  one of the words in that document to external reference material for the word by storing in a look
20  up table the starting and ending point addresses of the words in the open electronic document
21  which are determined relative to a starting address of the text in the open document." (*Id.* ¶ 5.)
22  The term "electronic database" is found nowhere in his declaration. Accordingly, Dr. Weissman's
23  opinion that "the specification does not show that the inventors of the '633 Patent possessed a
24  'beginning position address of [a] textual source material" stands unrebutted, and there is no
25  genuine dispute of fact as to lack of apparent possession of this limitation. (Weissman Decl. ¶ 36.)

26  Thus, the Court finds that the '720 Patent lacks written description for the term "textual
27  source material stored in an electronic database." The specification consistently refers to the
28  textual source material without suggesting that it is stored in a database, and thus fails to show

possession of this aspect of the invention (which was key to gaining allowance for the patent).

        2.      *"determining a beginning position address of a textual source material"*

Nor does the specification describe determining "the address at which a textual source material starts in an electronic database," as required by the Court's construction for the second part of this term. Sentius relies on three disclosures to argue otherwise.

First, in relation to Figure 1, the specification states that "[t]he [wordified] database 20 sources a grammar parser 23 and a link engine 22 that builds an index 21, which, in turn locates each textual and audio/visual reference in the source material." ('633 Patent at 5:19-22; *accord* '720 Patent at 5:9-12.) While this disclosure is probative of identifying references in the text, it does not refer to identifying the beginning position (much less an address) of the text itself. Dr. Weissman confirms—and Dr. Madisetti does not rebut—that this disclosure only "describe[s] to one of ordinary skill in the art . . . that the described system builds an index that records an association between supplemental content and words or phrases in a textual source." (Weissman Decl. ¶ 38; *see also* Madisetti Decl. ¶ 44 (opining that this text discloses "determin[ing] the starting and ending addresses of [] each word in the database," not the address for the starting point of the text).)

Second, Sentius relies, as it did during claim construction, on disclosures that words are indexed "based upon position offset from the beginning of the text." ('633 Patent at 7:30-49; *accord* '720 Patent at 7:26-47.) These disclosures were properly considered and rejected during claim construction. (*See* Claim Construction Order at 11:16-12:4.) As described there, Sentius had amended the claims to change "beginning position" to "an address on said electronic database for the beginning position" in order to narrow the claims.[3] (*Id.* at 4:2-5:15, 12:20-13:14.) Thus, an "address" for a beginning position of the textual material cannot now refer to the "beginning position" of the text itself. (*Id.* at 13:24-14:3.) Dr. Madisetti does not appear to opine otherwise. (*See* Madisetti Decl. ¶¶ 46-47 (citing the text without analysis).)

---

[3] When making the amendment, Sentius claimed that "[s]upport for this amendment is found in the Specification on page 10, line 19 through page 11, line 5, and in Fig. 2." (Dkt. No. 52-3 ("Amendment") at 7.) Sentius represented at the hearing for this motion that these citations refer to the same disclosures cited in its brief, and the Court does not consider otherwise.

Finally, Sentius relies on disclosures that refer to word cuts indexed by offset values created for the word cuts. (*See, e.g.*, '720 Patent at 7:29-30 ("[T]he [word] cuts are indexed based upon the position offset from the beginning of the text.").) Dr. Madisetti opines that "the starting and ending virtual addresses shown in [Figure 2] reasonably conveys to the skilled artisan that the inventor(s) had in mind a beginning position address in the database because these offset index values must necessarily be measured from some arbitrary assigned address." (Madisetti Decl. ¶ 48; *see also id.* ¶ 49 ("The fact that starting and ending addresses . . . are described as indicating offsets from the beginning of the text reasonably alone conveys to the skilled artisan that the inventors had in mind a beginning position address in the database because these offset index values must necessarily be measured from some arbitrary assigned address for the start of the text in the opened electronic document.").)

Although Sentius does not use this word, this last argument amounts to an inherency argument: Sentius appears to claim that the specification "necessarily possesses" the feature of determining the "the address at which a textual source material starts in an electronic database." *See Nuvo Pharmas*, 923 F.3d at 1382-83. That argument fails. Inherency arises only in a "narrow set of circumstances" when the invention necessarily possesses a feature, not where the feature is a plausible variation. *See id.*; *PersonalWeb Techs., LLC v. Apple, Inc.*, 917 F.3d 1376, 1382 (Fed. Cir. 2019) ("Inherency . . . may not be established by probabilities or possibilities." (quoting *PAR Pharma., Inc. v. TWI Pharma., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014))).

Here, Zoho expressly argued during claim construction that an "offset value" (including the start and end points of words) may be based on the beginning *character* position of the text— not the address at which the text begins in an electronic database. (*See* Joint Claim Construction Statement at 14.) Indeed, the Court expressly adopted Sentius' proposed construction of "offset value" as "a value from a beginning point"—*any* beginning point—and rejected Zoho's proposed construction based on "pure byte offsets." (Claim Construction Order at 16:21-21:21.) This broad claim construction now precludes Sentius from arguing that an offset necessarily involves determining a beginning address in an electronic database.

Accordingly, the Court finds that the specification fails to provide written description for

16

the term "determining a beginning position address of a textual source material stored in an electronic database." Although Sentius correctly argues that summary judgment cannot be granted in the face of expert disputes, there are no disputes here: Dr. Madisetti appears to agree that the specification does not expressly disclose the limitation, and Sentius' inherent disclosure argument fails as a matter of law.[4] Thus, Sentius fails to show disputed issues of fact for trial, and summary judgment is appropriate.[5]

## II. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Zoho's motion for summary judgment of invalidity for lack of written description of the asserted claims of the '633 Patent.

This Order terminates Docket Number 81.

**IT IS SO ORDERED.**

Dated: October 15, 2020

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

---

[4] Sentius claims that "Dr. Weismann's [sp] testimony cannot be credited given that it does not address what a skilled artisan would understand from the written description." However, Dr. Weissman is a skilled artisan, and he opines on his understanding of the written description. (Weissman Decl. ¶¶ 2-7, 11-13, 26.) Nothing more is required.

[5] Sentius cites *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360 (Fed. Cir. 2019), to argue that disputed issues remain. However, in that case, the specification disclosed the disputed limitation, albeit briefly, and the dispute centered on "the level of detail the . . . specification must contain." *Id*. at 1366-67. Here, by contrast, the specification fails to disclose the key limitation added to obtain allowance, even in the briefest terms. Thus, the closer case is *Cisco Systems*, 856 F.3d at 1008-09, where the specification described the invention prior to amendment and failed to support the amended claims.